Stewart, Appellant, *v.* Chernicky.

44

Argued October 1, 1969.   Before Bell, C. J., Jones, Cohen, Eagen, O'Brien, Roberts and Pomeroy, JJ.

*H. Ray Pope, Jr.,* for appellant.

*Arnold E. Dolby,* for appellees.

*Chester H. Byerly,* for appellees.

OPINION BY MR. JUSTICE EAGEN, May 27, 1970:

This action results from an alleged unauthorized strip mining of a portion of a tract of land by Peter Chernicky and E. G. Kriebel, Trading as C & K Coal Company [C & K Company], a partnership.

The tract consists of 21 1/4 acres located in Perry Township, Clarion County. By deed dated December 8, 1902, the then owner, D. W. Bartow, granted and conveyed to Horace A. Noble et al., all the coal in and under the tract with the right to remove the same without liability for injury to the surface. Bartow retained ownership of the surface.[1] On the dates here involved, the Thomas M. Stewart Estate, as Bartow's successor in title, was the owner of the surface. Vincent C. Conner and Lois Conner, as successors in title

---

[1] In Pennsylvania there may be three estates in land, namely, coal, surface and right to support, and these may be vested in different persons at the same time: *Commonwealth v. Fitzmartin,* 376 Pa. 390, 102 A. 2d 893 (1954); *Smith v. Glen Alden Coal Co.,* 347 Pa. 290, 32 A. 2d 227 (1943).

to Noble et al., were the owners of the coal. C & K Company was the lessee of the coal rights vested in the Conners.

The tract was remote, uncultivated woodland, not easily accessible, and its boundaries were not clearly distinguishable from those of the surrounding lands.[2] It was but one of 33 separate properties which the Conners had leased to the C & K Company in a single document dated March 8, 1962. The Conners owned both the surface and the coal rights in a portion of these, while in others they owned only the coal. In the lease this particular tract [the Stewart Tract] had been designated the "V. C. Conner Tract (Coal)," leading some to believe the Conners owned both the surface and the coal.[3] C & K Company never had it or the land adjacent to it surveyed, whereby the divided ownership might have been realized. As a result of these circumstances, six or seven acres of it were stripped in 1963 without the consent of the Stewart Estate, causing extensive damage to the surface. The Stewart Estate instituted this action seeking damages from C & K Company and the Conners. At trial, the jury returned a verdict in favor of the plaintiff and against all defendants in the amount of $10,200. Motions for judgment notwithstanding the verdict or a new trial were filed by all defendants. The court below granted the motions for judgment n.o.v. The Stewart Estate appealed.

The central issue is: Did the C & K Company have the right to remove the coal under the land involved by the strip mining method without liability for injury to

---

[2] As we explained in *New Charter Coal Co. v. McKee*, 411 Pa. 307, 191 A. 2d 830 (1963), however, the utility or quality of the land involved is not a determinative factor.

[3] Usually a tract is identified by the person who owns the surface with the owner of the coal designated in parentheses thereafter. The proper designation in this case should, therefore, have been: "Stewart Tract (Coal V. C. Conner)."

or destruction of the surface, regardless who owned that surface, or was such removal to be limited to shaft or deep mining?[4] In the latter situation, the C & K Company would be liable for what occurred.[5]

A party engaged in strip mining must either own (or lease from one who owns) both the estate of coal and the surface estate *or* own (or lease from one who owns) a coal estate which includes the right to employ the strip mining method, for such a process entails the actual stripping away of the outer covering of the terrain: *Owens v. Thompson,* 385 Pa. 506, 123 A. 2d 408 (1956).

Any interest and rights that the C & K Company has in the tract of land in issue derives from the lease it obtained from the Conners on March 8, 1962. Such lease contains the following pertinent provisions: "Nothing herein or hereinafter contained shall be construed as warranting the said leased premises or the quantity or quality of the coal that may be found in the thirty-three tracts listed under Exhibit 'A' herein. * * * Subject to the exceptions, reservations, covenants and conditions referred to in the preceding paragraph hereof, lessors do hereby grant and let unto lessees, *all* mining rights which *lessors now have* in and upon the real estate described in Exhibit 'A' hereto annexed.* * *

---

[4] "Strip mining, as the term indicates, is the stripping away of the earth surface and the horizontal withdrawal of the mineral deposits at hand. Shaft mining involves the sinking of a vertical shaft into the ground and the developing from that point of tunnels and galleries which serve as vantage points from which to withdraw and lift the coal deposits through the shaft. Shaft mining does a minimum of damage to the outer crust of the earth: strip mining does a maximum of damage. Strip mining is effected through steam shovels and bull dozers which turn up the top layer of the earth. . . .": *Rochez Bros., Inc. v. Duricka,* 374 Pa. 262, at 265, 97 A. 2d 825 (1953).

[5] Any liability of the Conners, the lessors, is derivative, and can exist only if the C & K Company is liable to the Stewart Estate.

It is expressly understood and agreed between the parties hereto, that as to those parcels or tracts of land set forth in Exhibit 'A' in which lessors do not own surface that lessors intend to grant hereby *only such mining rights in such lands as lessors may actually have or own therein."* (Emphasis added.) The land in issue is admittedly one of the thirty-three tracts listed in Exhibit "A" of the above lease. This lease, in effect if not in form, is a quitclaim deed[6] of all the mining rights of which the lessors were seized in the above tract. The interest and rights of the C & K Company in the specific tract in issue are thus co-extensive with those previously possessed by its lessors, the Conners.

The Conners clearly owned only the coal under the tract. Therefore, any right which the C & K Company might have had to strip mine this property must derive from the coal estate alone. To determine the nature and extent of this estate, which had been carved from the fee, reference must be made to the deed of severance wherein the separation in ownership occurred. This was the deed of December 8, 1902, supra.

This deed, after granting and conveying title to the coal in and under the tract to the Conners' predecessors in title, stated in pertinent part: "Together with the right of ingress, egress and regress over and through said lands for the purpose of *mining,* storing, manufacturing and removing said coal and such other coal as may be now owned or hereafter acquired by the said second parties, their heirs or assigns; *also* the right to drain and *ventilate said mines* by shafts or otherwise and to deposit the waste from said mines,

---

[6] "A quitclaim deed is one which purports to convey, and is understood to convey, nothing more than the interest or estate in the property described of which the grantor is seized or possessed, if any, at the time, rather than the property itself.": 26 C.J.S. Deeds §8; *accord, Greek Catholic Congregation of Olyphant Borough v. Plummer,* 338 Pa. 373, 12 A. 2d 435, 127 A.L.R. 1008 (1940).

and to build roads and structures with the necessary curtilege [sic] for said purposes; *with a full release of and without liability for damages for injury to the surface,* waters or otherwise arising *from* any of *said operations.* Together with all and singular the said property, rights, privileges, hereditaments, and appurtenances whatsoever thereunto belonging or in anywise appertaining, and the reversion and the remainders thereof, and all the estate, right, title, interest, property, claim and demand whatsoever of the said party of the first part, in law, equity, or otherwise howsoever of, in and to the said coal, coal space, mining rights, and *release of damages."* (Emphasis added.)

In construing this deed, it is the intention of the parties at the time of the transaction that governs, and such intention is to be gathered from a reading of the entire deed: *New Charter Coal Co. v. McKee,* supra; *Mt. Carmel Railroad Co. v. M. A. Hanna Co.,* 371 Pa. 232, 89 A. 2d 508 (1952). If the deed is ambiguous, then all of the attending circumstances existing at the time of the execution of the instrument should be considered to aid in determining the apparent object of the parties: *New Charter Coal Co. v. McKee,* supra; *Merrill v. Manufacturers Light and Heat Co.,* 409 Pa. 68, 185 A. 2d 573 (1962).

There is no express intent of the parties in this deed concerning the means by which the coal granted was to be mined, neither strip mining nor deep mining being specifically mentioned. The deed merely refers to "mining" in general. The intent of the parties must therefore be implied.

"Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, *while the other makes it inequitable, unusual, or such as reasonable men would*

*not be likely to enter into, the interpretation which
makes a rational and probable agreement must be pre-
ferred"*: *Wilkes-Barre Twp. School District v. Corgan,*
403 Pa. 383, 386-87, 170 A. 2d 97 (1961).

In this regard, this Court recognizes that *"strip
mining* is an accepted *manner* or *method* of coal min-
ing, which, with the use of modern huge and efficient
machinery, has become progressively more in vogue":
*Mt. Carmel Railroad Co. v. M. A. Hanna Co.,* supra, at
240. And this Court does not wish to interfere with
its use or hinder its economic viability. Yet we can-
not help but realize that "in view of the surface vio-
lence, destruction and disfiguration which inevitably
attend strip or open mining, . . . no land owner would
lightly or casually grant strip mining rights, nor would
any purchaser of land treat lightly any reservation of
mining rights which would permit the grantor or his
assignee to come upon his land and turn it into a battle-
ground with strip mining": *Rochez Bros., Inc. v.
Duricka,* supra, at 265-66. Therefore, "the burden rests
upon him who seeks to assert the right to destroy or
injure the surface" (*Merrill v. Manufacturers Light
and Heat Co.,* supra, at 73-74) to show some positive in-
dication that the parties to the deed agreed to authorize
practices which may result in these consequences. Par-
ticularly is this so where such operations were not com-
mon at the time the deed was executed.[7] See *Wilkes-
Barre Twp. School District v. Corgan,* supra, and *Mer-
rill v. Manufacturers Light and Heat Co.,* supra.

The most critical clause in the above deed relevant
to the method of mining authorized is: "also the right
to drain and ventilate said mines by shafts or other-
wise. . . ." Ventilating is a feature only of shaft or deep

---

[7] There was testimony that strip mining in the soft coal fields
did not begin in Clarion County until 1938, although strip mining
was not unknown in 1902, when the deed here involved was ex-
ecuted.

mining: *Rochez Bros., Inc. v. Duricka,* supra. Yet this particular clause begins with "also," which could imply that to ventilate was an additional right to those already previously granted rather than a word of limitation. See *Mt. Carmel Railroad Co. v. M. A. Hanna Co.,* supra. Such an interpretation, however, fails to take into account that "ventilate" refers to "said mines." This seems to connote that the mines for which provisions were made in prior clauses were expected to require ventilation, leading to the conclusion that the parties contemplated shaft mining.

Under this interpretation, the clause in the deed of severance granting a "full release of and without liability for injury to the surface, waters, or otherwise" would not relieve the C & K Company of liability. It is a limited release from liability, because it is only applicable if the injury arises "from any of the said operations." If there is only the right to shaft or deep mine, the reference to "said operations" limits the release to damages caused by such shaft or deep mining. It would not be applicable to damage caused by the use of strip mining processes.

Yet, it is argued, this deed was a *grant* of certain mineral rights rather than a reservation of such rights.[8] "If a person grants a portion of his property to another and the grant is susceptible of more than one interpretation, the words of the grant are to be construed most strongly against the grantor and more favorably to the grantee . . . unless, of course, the grantee drafted the grant and was therefore responsible for the ambiguity": *New Charter Coal Co. v. McKee,* supra, at 312; accord, *Merrill v. Manufacturers Light and Heat Co.,* supra.

---

[8] In determining the scope of mining rights, where the rights are contained in an ambiguous reservation, the construction must be against the reservation: *New Charter Coal Co. v. McKee,* supra; *Heidt v. Aughenbaugh Coal Co.,* 406 Pa. 188, 176 A. 2d 400 (1962); *Wilkes-Barre Twp. School District v. Corgan,* supra.

Therefore, it is urged that doubts should be resolved so as to enlarge the rights of the grantee, which in this case means resolving ambiguities in favor of permitting strip mining.

This factor does distinguish this case from *Rochez Bros., Inc. v. Duricka,* supra, since the language there construed by the Court was contained in a *reservation* rather than a grant. Yet, although these rules of construction are valuable aids of interpretation, they ought not to be so liberally applied as to make a contract for the parties that they did not intend to make between themselves.

The right to mine and remove coal by deeds conveying land in language peculiarly applicable to underground mining does not include the right to remove such coal by strip mining methods: *Rochez Bros., Inc. v. Duricka,* supra. Nor will a mere authorization to "mine," without more, encompass the right to strip mine, for the reasons expressed before.[9] The jury

---

[9] Strip mining, with the development of power shovels and other modern machinery, in many cases is the least costly method of removing coal and renders feasible the removal of coal that could not have been removed by deep mining methods: *New Charter Coal Co. v. McKee,* supra. But it should *not* be viewed as merely an improved process of mining, such that a grant of the right to mine, the parties contemplating only deep mining, would include mining by an improved process, i.e., strip mining. Any language in this Court's opinion in *Commonwealth v. Fisher,* 364 Pa. 422, 72 A. 2d 568 (1950), and other cases relying thereon, which may have left this mistaken impression, should be disregarded. In the context of mining, the surface estate is somewhat analogous to a servient estate in the easement situation. Referring specifically to some cases analyzed in *Commonwealth v. Fisher,* supra, in this regard, limitations on the use of improved processes of science were also mentioned, which were not quoted in *Commonwealth v. Fisher,* supra. "The owner of the dominant estate may not exercise rights granted to it without regard to the rights of the servient owner": *Taylor v. Heffner,* 359 Pa. 157, 163, 58 A. 2d 450 (1948). "Such improved process as science may discover or mechanical ingenuity invent . . .

apparently concluded that the C & K Company had not met its burden of establishing a right to strip mine, either by the plain meaning of the words of the deed or by the interpretation of those words in the light of the surrounding circumstances at the time of the execution of the deed. This conclusion of the jury was a permissible one in the circumstances, and we find it was error to have set aside that verdict by the granting of a judgment non obstante veredicto.

It is well settled that a judgment n.o.v. will be entered only in a clear case, and that any doubts will be resolved in favor of the verdict: *Cummings v. Nazareth Borough,* 427 Pa. 14, 233 A. 2d 874 (1967); *Pantuso v. Pittsburgh Motor Coach Co.,* 360 Pa. 464, 62 A. 2d 56 (1948). "No judgment can be entered . . . against the verdict if binding directions would not have been proper at the close of the trial": 6A Standard Pennsylvania Practice 209, citing numerous cases. *Commonwealth v. Fitzmartin,* supra, was not controlling, and no such binding instructions were proper in the circumstances of this case.

In *Commonwealth v. Fitzmartin,* supra, the parties stipulated and agreed and the Chancellor found "that the coal which the defendants have been removing by the strip mining method cannot be removed by deep mining. Unless, therefore, the words 'all the coal . . . in . . . [the] . . . surface of said land . . .' [in the deed] refer to and reserve the right to strip mine the coal, they would be meaningless, because the coal on the sur-

---

may not be an injurious or offensive process not contemplated in the reservation": *Richardson v. Clements,* 89 Pa. 503, 506 (1879). Nor should it create a significant additional burden on the servient estate: *Dowgiel v. Reid,* 359 Pa. 448, 59 A. 2d 115 (1948). Strip mining, as compared to deep mining, impairs the rights of the surface owner, destroys the surface itself, and significantly increases the burden on the surface estate by virtually destroying all economic utility of the surface.

face cannot, the parties agree, be removed by deep mining." (Page 399.) As we said in *Wilkes-Barre Twp. School District v. Corgan,* quoted supra: "Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, *while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred."* Under the above described circumstances in *Fitzmartin,* to permit strip mining was the more rational and probable interpretation: *Accord, Bridgeview Coal Co. v. Burchinal,* 201 Pa. Superior Ct. 602, 193 A. 2d 755 (1963). There is no claim of such special circumstances here. The judgment n.o.v. in favor of the C & K Company will therefore be vacated.

The court below did not pass upon the C & K Company's motion for a new trial because of its entering judgment n.o.v.[10] The record will therefore be remanded for disposition of the motion for a new trial, with a direction that if the motion for a new trial is refused, the verdict of the jury is to be reinstated and judgment entered thereon. The C & K Company's objections as to the manner in which the evidence was introduced to show damages should most appropriately be considered by the trial court on remand when passing upon the motion for a new trial.[11]

---

[10] In its opinion the court below stated: "As to defendants' motions for a new trial, there is merit in their contention that the verdict was against the evidence, the law, and the charge of the court. We will not discuss these motions for the reason the granting of Judgment N.O.V. for defendants makes it unnecessary."

[11] A judgment n.o.v. does not lie for the correction of errors in the admission or exclusion of evidence, which errors may properly be the subject of a motion for a new trial: *Hershberger v. Hersh-*

It will be remembered that the liability of the Conners is derivative and contingent upon the liability of the C & K Company, their lessee. Thus when the trial court granted a judgment n.o.v. to the C & K Company, it was required to also grant one to the Conners.[12] We have held that it was error for the court below to have granted the C & K Company a judgment n.o.v. Therefore, the Conners' judgment n.o.v. must also be vacated, unless the grounds argued below and again on this appeal, which are peculiar to the Conners and independent of those propounded by the C & K Company, are sufficient in and of themselves to sustain the judgment n.o.v. We will now consider these additional arguments of the Conners.

Appellees Conners leased their mineral rights in this property to the C & K Company, whom the jury found had committed tortious conduct. A lessor of a coal mine prima facie is not liable to the owner of the surface for the negligent acts of his lessee (*Hill v. Pardee,* 143 Pa. 98, 22 A. 815 (1891)), nor is the vendor of a coal mine under a quitclaim deed prima facie responsible for negligent mining by his vendee which results in damage to the surface (*Greek Catholic Congregation of Olyphant Borough v. Plummer,* 338 Pa. 373, 12 A. 2d 435, 127 A.L.R. 1008 (1940)). It is not important, therefore, for this purpose, whether the Conners-C & K Company lease is merely a lease of the coal rights or actually a quitclaim deed of the same: *Shenandoah Boro. v. Philadelphia,* 367 Pa. 180, 79 A.

---

*berger,* 345 Pa. 439, 29 A. 2d 95 (1942); *Stevenson v. Titus,* 332 Pa. 100, 104 n.2, 2 A. 2d 853 (1938).

12 "Where the liability of one defendant is derivative and depends on the existence of primary liability on the part of the other defendant, if the latter is entitled to judgment n.o.v. for lack of proof of liability, the other defendant is also entitled to such judgment": 6A Standard Pennsylvania Practice 224; *accord, Koerth v. Turtle Creek,* 355 Pa. 121, 49 A. 2d 398 (1946).

2d 433, *cert. denied* 342 U.S. 821, 72 S. Ct. 39, 96 L. Ed. 621 (1951).

It has been held, however, that if the lessor directly participates in the tortious conduct of its lessee, the lessor is liable for those negligent acts of its lessee in which it participated.[13] There is no evidence of such direct participation here. The appellant did not prove in the trial that either Vincent C. or Lois Conner were on the subject 21 1/4 acre tract during the strip mining operations of the lessee or that they, either personally or through agents, participated in any way in the management or direction of the stripping operations of their lessee.

"Mere collection of 'rents and royalties' as a part of the purchase price does not constitute a participation in the mining": *Greek Catholic Congregation of Olyphant Borough v. Plummer*, 338 Pa., supra, at 380. "The contract was *lawful* and the proceeds the defendant received constituted the consideration named therein. Defendant [in this case, the Conners] might legally have received for quit-claiming her interest, one dollar or one thousand dollars. Whatever she received, the law permits her to retain. If the defendant had been paid $12,736 for her quit-claim deed the day she executed it, and if the . . . Coal Company [here C & K Company] had been enjoined immediately thereafter from mining this coal, this defendant [the Conners] could have kept that money against the claim of *either* the plaintiff [here the Stewart Estate] *or* the coal

---

[13] *Kistler v. Thompson*, 158 Pa. 139, 27 A. 874 (1893) (Lessor intervened in the mining operations and gave frequent directions relevant thereto.) ; *Dundas v. Muhlenberg's Executors*, 35 Pa. 351 (1860) (Lessor authorized and helped finance the construction of a shaft, which extended onto another's property and from which coal was extracted for which the lessor was compensated in royalties.) ; *Telford Coal Co. v. Prothero*, 24 Pa. D. & C. 183 (1935) (Lessor actually supervised and directed the removal of the coal.).

company [here C & K Company], unless she was guilty of a fraud, and no allegation of fraud is made. . . . Any time the Company's mining had been stopped by this plaintiff the payments to this defendant would have instantly ended": *Greek Catholic Congregation of Olyphant Borough v. Plummer*, 347 Pa. 351, 355, 32 A. 2d 299 (1943).

This portion of the case is controlled by this Court's decision in *Greek Catholic Congregation of Olyphant Borough v. Plummer*, 338 Pa., supra, wherein we said, at 378: "There is nothing in a quit-claim deed which should incite the grantor [grantee?] therein to commit a trespass by exercising dominion over property he did not own. If there is any doubt of his ownership, he proceeds at his own peril and not at the peril of the party who quit-claimed to him. He is supposed to know the law, and the law is that 'a quit-claim deed is one which purports to convey, and is understood to convey, nothing more than the interest or estate of which the grantor is seised or possessed, if any, at the time.' 18 C.J. p. 156, sec. 32."[14]

There being no evidence that the lessors, the Conners, directly participated in the tortious conduct of their lessee, the C & K Company, judgment n.o.v. was properly entered below in their favor and against the Stewart Estate.

Judgment n.o.v. of appellee C & K Company is vacated, and the record remanded for further proceedings

---

[14] "When A quit-claims to B he is not 'intentionally causing' B to commit a trespass on the land in respect to which A quit-claimed whatever title or interest (if any) he had. If B proceeds to exercise dominion over that land, he does so at his own peril, and if it is shown that A had no title or interest in the land he quit-claimed, B's quit-claim deed is no defense to any action of trespass nor does that deed make A a joint tort-feasor with B": *Greek Catholic Congregation of Olyphant Borough v. Plummer*, 338 Pa., supra, at 381.

58

consistent with this opinion. The entry of judgment n.o.v. in favor of the Conners is affirmed.[15]

[15] In this case two judgments were entered below, but only one appeal was filed. We *again* caution the bar against this practice. See *General Electric Credit Corp. v. The Aetna Casualty and Surety Co.*, 437 Pa. 463, 263 A. 2d 448 (1970).