In re LAUREL RUN CORPORATION, Debtor.

G.A. RESOURCES, INC., G.A. Resources, A Pennsylvania Partnership, George Albert, Jr. and Albert G. Albert, Plaintiffs,

v.

LAUREL RUN CORPORATION, Defendant.

LAUREL RUN CORPORATION, Plaintiff,

v.

G.A. RESOURCES, Defendant.

Bankruptcy No. 5–92–01878. Adv. Nos. 5–92–0221, 5–92–0190.

United States Bankruptcy Court, M.D. Pennsylvania, Wilkes–Barre Division.

April 6, 1994.

ments; indeed, focusing upon these agreements would only strengthen the Fund's position.

Andrew Hailstone, Scranton, PA, for debtor.

Steven Roth, Wilkes–Barre, PA, for G.A. Resources.

### OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

On October 13, 1992, G.A. Resources, A Pennsylvania Partnership, (hereinafter "G.A. Resources"), filed a Complaint for Injunctive Relief against Laurel Run Corporation, (hereinafter "Debtor"), alleging that a certain culm lease and royalty agreement entered into between the parties on September 13, 1991 had been breached by the Debtor resulting in damages to G.A. Resources without compensation for same by the Debtor.

Notwithstanding this injunction complaint, the Debtor, on November 30, 1992, initiated their own adversary proceeding against G.A. Resources seeking to cancel the aforesaid agreement; requiring G.A. Resources to repay Debtor theretofore paid royalty payments paid by the Debtor to G.A. Resources; and adjudicating G.A. Resources as a non-creditor vis-a-vis this bankruptcy.

The controversy between the parties turns on whether G.A. Resources had sufficient interest in the real estate in question to enter into a coal lease and royalty agreement with the Debtor as it did on September 13, 1991. The Debtor maintains that the title of G.A. Resources is founded on a mere right of way given to its predecessor in interest, The Lehigh Coal & Navigation Company, and which right of way terminated upon the railroad ceasing to operate. The Debtor argues that since G.A. Resources has no record title then the agreement between Debtor and G.A. Resources need not be assumed and the Debtor is therefore free to negotiate its own agreement with the true owner of the land.

On the other hand, G.A. Resources claims that it has fee simple title in the surface of the property, which gives it authority to enter into the agreement of September, 1991 and alternatively, even if the interest of G.A. Resources is questionable, the Debtor in Possession has no standing to challenge the title of G.A. Resources.

## DISCUSSION

The rights and privileges accorded to G.A. Resources is necessarily dependent on the nature of the Agreement dated October 9, 1917 between the Central Railroad Company of New Jersey, The Lehigh Coal & Navigation Company, and The Delaware & Hudson Company.

G.A. Resources maintains that this conveyance gave to its predecessor-in-interest a fee simple title to a one hundred foot wide strip of land described more specifically in that Agreement. Having fee simple title, G.A. Resources concludes that it also has the right to strip-mine that land or to allow others to strip-mine that land.

Laurel Run Corporation, the Debtor herein, maintains that the Agreement of October 9, 1917 vested a mere right-of-way into the predecessor of G.A. Resources, which right-of-way terminated when the railroad ceased operations. According to Laurel Run, the Agreement they had fashioned with G.A. Resources should be nullified since both parties were laboring under the misconception that G.A. Resources had an interest in the mineral rights underlying the land in question.

■ Initially, we note that property rights are determined under state law. *Universal Bonding Insurance Co. v. Gittens and Sprinkle Enterprises, Inc.*, 960 F.2d 366 (3rd Cir. 1992) at page 369.

Our analysis of what rights were conveyed by the 1917 Agreement depends solely on this Court's interpretation of that written Agreement. *Brookbank v. Benedum–Trees Oil Co.*, 389 Pa. 151, 131 A.2d 103 (1957).

As was stated in *Brookbank*,

"Upon the construction of this instrument depend the rights of the parties, and, in construing this instrument, our primary object must be to ascertain and effectuate what the parties intended: *Citing Hess v. Jones*, 335 Pa. 569, 7 A.2d 299.[6]

---

[6] In interpreting this instrument certain rules of construction are applicable: (1) the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words *Teacher v. Kijurina*, 365 Pa. 480, 486, 76 A.2d 197; *Kimmel v. Svonavec*, 369 Pa. 292, 295, 85 A.2d 146; *Caldwell v. Fulton*, 31 Pa. 475; (2) effect must be given to all the language of the instrument and no part shall be rejected if it can be given a meaning, *Ivey Co. v. Franklin Associates, Inc.*, 370 Pa. 225, 231, 232, 87 A.2d 236; *Hardes v. Penn Charcoal & Chemical Co.*, 175 Pa.Super. 431, 436, 107 A.2d 176; (3) if a doubt arises concerning the interpretation of the instrument it will be resolved against the party who prepared it, *Wiegand v. Wiegand*, 349 Pa. 517, 520, 37 A.2d 492; *Commonwealth to use of Herzog v. Henry W. Horst Co.*, 364 Pa. 403, 406, 72 A.2d 131; (4) unless contrary to the plain meaning of the instrument, an interpretation given it by the parties themselves will be favored, *Monongahela Street Railway Co. v. Philadelphia Co.*, 350 Pa. 603, 618, 619, 39 A.2d 909; *Cirotti v. Wassell*, 163 Pa.Super. 292, 60 A.2d 339; (5) 'to ascertain the intention of the parties,

the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed', *Baederwood, Inc., v. Moyer*, 370 Pa. 35, 40, 41, 87 A.2d 246, 248; *Silverstein v. Hornick*, 376 Pa. 536, 103 A.2d 734." *Brookbank v. Benedum–Trees Oil Co., supra*, at pages 156 and 157, 131 A.2d 103.

It is important to understand that the Central Railroad Company of New Jersey ("Central Company") entered into this Agreement as the lessee in possession of an operating railroad. The Lehigh Coal & Navigation Company ("Lehigh Company") was the actual owner of the railroad and The Delaware & Hudson Company ("Delaware Company") was "prosecuting mining operations underneath said tracks". *1917 Agreement, Deed Book 649, page 455.*

The Agreement was ostensibly "... entered into by the parties hereto consistent with their present understanding of mining conditions at this point; and as an inducement to said new agreement, the Delaware Company has agreed to reaffirm the title of said Central Lehigh Companies to a strip of land and right of way one hundred (100) feet in width, ...". *1917 Agreement, Deed Book 649, page 455.*

■ It has been said that where an instrument purports to convey a "strip of land", it evidences an intention to convey fee simple title in the absence of any expressed contrary intent. *Brookbank, supra*, at pg. 161, 131 A.2d 103. A railroad right of way typically connotes a conveyance of an easement or conditional fee. *Brookbank, supra*, at pg. 166, 131 A.2d 103.

G.A. Resources has advanced the argument that certain legislation passed by the Pennsylvania state legislature in 1837, had the effect of conveying fee simple title to the predecessor of G.A. Resources i.e., the Lehigh Company. This Court's review of that Act suggests that this statute gave the railroad the authority to effect an involuntary taking of certain property for railroad purposes. There was no evidence introduced that the Lehigh Company actually secured the property under the provisions of this act. Nevertheless, there was no disagreement

that the Delaware Company had the authority to convey title in 1917.

■ G.A. Resources directs our attention to paragraph "FIRST" of the Agreement which utilizes the following terminology:

"That the said Delaware Company by these presents has granted, bargained, sold, aliened, remised, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto said Central Lehigh Companies[1] and to their successors and assigns forever, ..." *1917 Agreement, Deed Book 649, page 456.*

G.A. Resources suggests that this language is typically associated with the conveyance of fee simple title.

The Supreme Court of Pennsylvania in *Brookbank* made clear that these words are merely a "... certification of the quantum and quality of the grantors' estate, not that which is being conveyed ... Even the strongest words of present conveyance to a grantee, his heirs and assigns, or successors and assigns, do not always convey an estate in fee simple, if other parts of the agreement show that this was not the intention of the parties." *Brookbank, supra*, at page 160, 131 A.2d 103.

It is further important to our analysis that the 1917 Agreement at Deed Book 649, page 457 adds to the described land, "... such additional width as may be required and necessary for all slopes and fills;".

"When a railroad obtains a 'right of way', it has the right to use all the suitable materials, except timber, within the lines of its way for the construction and maintenance of its road." *Hall v. Delaware L. & W.R. Co.*, 270 Pa. 468, 113 A. 669, 21 A.L.R. 1128 (1921).

This phrase, accordingly, certainly conveys the mutual intention of the parties that sufficient land to accommodate the operation of the railroad be conveyed regardless of the description in the Agreement.

Of course, what follows that last quoted phrase may be the most obvious indication of the intention of the parties. "Excepting and

1. Described by the agreement as referencing both Central Company and Lehigh Company.

reserving, however, unto it, said Delaware Company, a portion of the coal underneath said strip or parcel of land and the right to mine the same as hereinafter provided:" 1917 Agreement, Deed Book 649, page 457.

This enunciates the clear intention of the parties that the Delaware Company reserved the coal rights underneath the strip of land, a pronouncement that would be unnecessary if a mere right of way was the subject of the 1917 agreement.

G.A. Resources also refers to the habendum clause as evidencing its acquisition of a fee simple title. That clause reads as follows: "TO HAVE AND TO HOLD said strip or parcel of land last above described unto the said Lehigh Company as such lessor as aforesaid and unto the said Central Company as such lessee as aforesaid, their successors and assigns forever." 1917 Agreement, Deed Book 649, page 457.

■ While the omission of a habendum may be some indication of an intention not to convey a fee (*Brookbank, supra,* at page 162, 131 A.2d 103), the converse may not necessarily be true. Though a habendum clause may be used to limit a grant, as was the case in *Nallin–Jennings Park Co. v. Sterling,* 364 Pa. 611, 73 A.2d 390 (1950), it certainly cannot be used to expand a grant; "... the document itself, and that only, can, in the first instance, be looked at to discover the extent and nature of the agreement and the terms of the grant. If on the face of the document no doubt arises that the words are used in their primary sense, and if, read in that sense, they are plain and unambiguous, the matter is concluded." *Id.* at page 615, 73 A.2d 390, citing *Gale on Easements,* p. 80.

Paragraph "SECOND" of the Agreement made clear that the Delaware Company could "... completely remove all the coal contained in the coal pillars underneath said strip or parcel of land, excepting such coal as is located within the Areas marked 'X', 'Y', 'Z' on said hereto attached plan. All such mining so as aforesaid to be done by said Delaware Company shall be done in accordance with the latest methods and most approved practices employed in mining operations of this character.". 1917 Agreement, Deed Book 649, page 458.

The paragraph just reviewed clearly compliments the reservation clause reserving to the Delaware Company the coal underneath the strip of land purportedly conveyed; with the exception of those areas marked "X", "Y" and "Z" on the map.

The paragraph identified as "THIRD" clears up the mystery as to why "X", "Y" and "Z" were not permitted to be mined. It reads as follows,

"The Delaware Company, at its own sole cost and expense, hereby agrees to completely fill with rock, culm and refuse all the chambers, gangways, headings and other openings now existing in said Areas 'Y' and 'Z' so as to render said Areas 'Y' and 'Z' as nearly as possible as solid and intact as they were before any coal was mined and removed therefrom.

And it, said Delaware Company, further agrees to likewise fill, at its own sole cost and expense, all the chambers, gangways, headings and other openings now existing in said Area 'X' if, in the judgment of the duly appointed engineers of the parties hereto, such filling is deemed necessary. Said necessity for so filling the existing openings of said Area 'X' shall be deemed existent if the surface surrounding said Area 'X' shall show any signs of subsidence during or after the removal of the coal pillars in the territory lying between said Area 'X' and the outcrop line of the coal bed." 1917 Agreement, Deed Book 649, page 458.

Paragraph "THIRD" clearly identifies that the elimination of the ability to mine "X", "Y" and "Z" was not intended by the parties to exist because that coal may have been owned by others, but rather to give comfort to the users of the surface i.e., the Lehigh Company, that certain sections, possibly more critical in the operation of the railroad than others, will be assured of a sufficient degree of stability.

Paragraph "FOURTH" provides additional evidence that the parties to this Agreement intended to protect the right of surface support. That paragraph reads as follows:

"In the event of any subsidence of the surface of said strip or parcel of land resulting from the mining operation of said Delaware Company, it, said Delaware Company, shall bear the entire cost and expenses incurred by said Central Company in regrading, reballasting and resurfacing its, said Central Company's, tracks located thereon, and it, said Delaware Company, shall also bear all additional cost and expense incurred by said Central Company in maintaining watchmen or other necessary protection at said point for the purpose of protecting trains against any unusual disturbances of the surface or the alignment of said tracks." 1917 Agreement, Deed Book 649, page 459.

Paragraph "FIFTH" includes language that the Delaware Company agreed to place an engineer in direct charge of mining, which engineer would regularly report to the officials of the Central Company so that the Central Company could "... adopt and provide all necessary precautions for the safe operation of its train over its tracks at this point.". 1917 Agreement, Deed Book 649, page 459.

"In Pennsylvania there may be three estates in lands, namely, coal, surface and right to support, and these may be vested in different persons at the same time." *Stewart v. Chernicky*, 439 Pa. 43, 266 A.2d 259 at Footnote 1 (1970).

This Court is convinced that the paragraphs heretofore reviewed indicated an intention to convey a fee simple title in both the surface estate as well as the right to support.

The absence of a reversion clause clearly supports the holding that this Agreement did more than convey a mere right of way for railroad purposes.

Although there is no "warranty of title", it was the clear intention of the parties to "reaffirm the title" of the Central Company and the Lehigh Company. We therefore conclude that the Delaware Company retained ownership of the coal while recognizing the fee simple title of the Lehigh Company to the surface and the right of surface support.

This takes us to the second issue addressed by the parties being whether the Agreement of 1917 permitted G.A. Resources as successor to the Lehigh Company the right to strip-mine the land described therein.

As stated in *Stewart v. Chernicky, supra,* the burden is on a strip mine operator to show some positive indication that the parties had agreed that coal could be removed by stripping operation. Although G.A. Resources was not the operator of a strip mine, it does assert a right to strip-mine and to negotiate the right to strip-mine with others such as the Debtor herein.

"A party engaged in strip mining must either own (or lease from one who owns) both the estate of coal and the surface estate *or* own (or lease from one who owns) a coal estate which includes the right to employ the strip mining method, for such a process entails the actual stripping away of the outer covering of the terrain." *Stewart v. Chernicky, supra,* at page 47, 266 A.2d 259.

■ We have heretofore concluded that the predecessor in title to G.A. Resources i.e., the Lehigh Company, owned the surface estate but did not possess the coal estate. It therefore follows that, absent the ownership of mineral rights, or the lease of such mineral rights, G.A. Resources can neither strip-mine nor authorize another to strip-mine.

Having made such determinations, the Court will now visit those Motions pending before us.

In their First and Second Affirmative Defense, G.A. Resources has alleged that the Debtor, as lessee, is either estopped or lacks standing to challenge the title of G.A. Resources. Our analysis of Pennsylvania law appears to support that proposition. In *Clark v. Lehigh & Wilkes–Barre Coal Co.,* 250 Pa. 304, 95 A. 462 (1915), the lessor contracted to lease the coal under four tracts of land only three of which were actually owned by the lessor. The coal under the fourth parcel was actually owned by the lessee. The Supreme Court of Pennsylvania noted that even though the lessor claimed title to the entire tract, the public record would have given actual notice to the parties

to the transaction. Accordingly, if the lessee was induced to enter into the lease by a mistake, it was one of law and not of fact. Under those circumstances, "... it is settled that equity will not relieve against a mistake of law." *Id.* at page 312, 95 A. 462.

"The rule is stated by Mr. Pomeroy as follows:

'The doctrine is settled that, in general, a mistake of law, pure and simple, is not adequate ground for relief. Where a party with knowledge of all the material facts, and without any other special circumstances giving rise to an equity in his behalf, enters into a transaction affecting his interests, rights, and liabilities, under an ignorance or error with respect to the rules of law controlling the case, courts will not, in general, relieve him from the consequences of his mistake.'

'If ignorance of the law were generally allowed to be pleaded, there could be no security in legal rights, no certainty in judicial investigations, no finality in litigations.'" *Id.* at pages 312 and 313, 95 A. 462 citing 2 Pom.Eq.Jur. [3d Ed.] § 842.

■ This Court therefore concludes that the Agreement between the Debtor and G.A. Resources, the Partnership, will not be cancelled inasmuch as it has been rejected by the Debtor's failure to assume such under the provisions of 11 U.S.C. § 365(d)(4).

■ Moreover, since the Debtor paid G.A. Resources voluntarily under the terms of the 1991 Agreement and did, in fact, receive the benefit of its bargain i.e., the right to transport coal across the surface, there appears to be no equitable or legal reason why G.A. Resources should be required to repay the Debtor royalty payments made to it merely because the record owner is an entity known as G.A. Resources, Inc.

■ Furthermore, the coal lease having been rejected, G.A. Resources, the Partnership, can be presumed to be a creditor by reason of the lease rejection pursuant to 11 U.S.C. § 502(b)(6).

■ Turning our attention to G.A. Resources' Complaint for Injunction, this Court concludes that all of the elements necessary for the grant of an injunction are present since the lease has been deemed rejected, the Debtor is not authorized to cross the surface of the land even in order to recover minerals which may have been contracted from the owner of those mineral rights. As we have earlier concluded, absent the consent of the owner of the surface, a strip mine operator cannot recover minerals in such a fashion.

Since destruction of the surface of the land constitutes an irreparable injury and since G.A. Resources has demonstrated the validity of their title to the surface and to surface support, this Court concludes that an injunction should be granted against Laurel Run Corporation preventing their further trespass on the surface of said land.

We issue the attached Order.

### *ORDER*

For those reasons set forth in the attached Opinion, judgment is entered in favor of the Plaintiff in Adversary No. 5–92–0221 and the Defendant in Adversary No. 5–92–0190.

Laurel Run Corporation is enjoined from further trespass on the lands of G.A. Resources, Inc.

