[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 311.]

GRAHAM, APPELLANT, *v*. DRYDOCK COAL COMPANY,

APPELLEE; HOLMES ET. AL., APPELLANTS.

[Cite as *Graham v. Drydock Coal Co.*, 1996-Ohio-393.]

*Mining—Deed severing mineral estate from surface estate, and reserving right to use surface incident to mining coal, does not reserve right to strip-mine to mineral owner, when.*

A deed which severs a mineral estate from a surface estate, and which grants or reserves the right to use the surface incident to mining coal, in language peculiarly applicable to deep-mining techniques, whether drafted before or after the advent of strip mining, does not grant or reserve to the mineral owner the right to remove coal by strip-mining methods. (*Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, expanded and clarified.)

(No. 95-313—Submitted March 6, 1996—Decided August 14, 1996.)

APPEAL from the Court of Appeals for Athens County, No. 93CA1599.

———————

{¶ 1} The tract at issue in this case consists of approximately 300 acres of farmland in Athens County. The fee simple owner of the entire tract in 1955 was Cambria Mining Company ("Cambria"), which deeded the surface rights to approximately 234 acres of the land to Helen Holmes for farming purposes, but retained the rights to all of the minerals in the land for itself. In 1962, Cambria deeded the surface of the rest of the tract to Holmes with a similar reservation clause. The Holmes family rented the land as a farm prior to its purchase of the surface rights and has continued farming it to the present.

{¶ 2} The reservation clauses in the deeds, which were both drafted by Cambria, are substantially the same. They each clearly provide for the ownership

of all the coal and all the other minerals in Cambria and for Cambria's right to remove those minerals. They further provide for Cambria's use of some portion of the surface in the process of the removal of its minerals. Ownership of the surface, however, is granted entirely to Helen Holmes.

{¶ 3} Such deeds have long been common in the mineral-rich areas of the state. See, *e.g.*, *Gill v. Fletcher* (1906), 74 Ohio St. 295, 78 N.E. 433, construing an 1838 deed with a similar severance of interests. These deeds serve a particularly valuable purpose in maximizing the utility and productivity of the land by allowing simultaneous use by those who extract minerals and those who till the surface. The clauses in the deeds, however, have produced a dispute between the successors in interest of Cambria and Helen Holmes.

{¶ 4} The deeds at issue expressly recognize the agricultural intentions of the Holmes family but do not mention strip mining. Cambria's successor, Drydock Coal Company ("Drydock"), possessed of technology that did not exist at the time the subject deeds were drawn, desires to extract coal, which is not removable by deep mining, using modern strip-mining methods. Helen Holmes' successors in interest, however, Everett Holmes, Jr. and Joan Holmes ("the Holmeses, executed a contract with appellant James F. Graham in 1990, entitled "Surface Lease for Coal," which conveys to Graham the right to strip-mine coal from the property. The coal does not belong to the Holmeses, and therefore has not been transferred to Graham.

{¶ 5} In July 1992, Graham filed a complaint in the Athens County Court of Common Pleas seeking a declaratory judgment stating that, although Drydock owned the coal, it did not have the right to strip-mine the surface. Drydock filed a counterclaim and a third-party complaint against the Holmeses alleging that the surface lease between the Holmeses and Graham was void on the grounds that Drydock owned all the minerals and the right to extract them. The trial court granted partial summary judgment to Drydock, but specifically stated that the issue

2

of whether Drydock owned the right to strip-mine the land was not properly before the court at that time. On appeal, the Court of Appeals for Athens County reversed the judgment and instructed the trial court to determine whether Drydock owned the right to strip-mine or whether the Holmeses had retained an interest that could be transferred to Graham and could effectively prevent Drydock from strip mining.

{¶ 6} The trial court found that Drydock's mineral rights did not include the right to strip-mine the property. Drydock appealed, and the court of appeals reversed the trial court again, this time holding that, as a matter of law, Drydock did have the right to strip-mine the property. It is from that decision that the current appeal is taken.

{¶ 7} The cause is now before this court upon the allowance of a discretionary joint appeal by Graham and the Holmeses.

_____

*Vorys, Sater, Seymour & Pease*, *John C. Elam* and *Michael G. Long*, for appellant Graham.

*John P. Lavelle* and *Jack V. Oakley*, for appellee.

*Donald Wirtshafter*, for appellants Everett and Joan Holmes.

*Neal S. Tostenson*, urging reversal for *amicus curiae*, Ohio Mining and Reclamation Association.

*Larry R. Gearhardt*, urging reversal for *amicus curiae*, Ohio Farm Bureau Federation.

_____

**MOYER, C.J.**

{¶ 8} The issue before the court is whether a deed which severs a mineral estate from a surface estate, which is drafted after the advent of strip mining in the region, and which grants the right to use the surface incident to mining coal, in language peculiarly applicable to deep-mining techniques, reserves the right to remove coal by strip-mining methods.

{¶ 9} The parties agree that each possesses precisely the same property rights as their predecessors in interest, the signatories to the original deeds. Their respective rights, therefore, are determined by our construction of the 1955 and 1962 deeds between Cambria and Helen Holmes. The issue raised in the construction of the deeds is whether the drafting of the subject deeds after the advent of strip mining in Ohio dictates a result different from that prescribed by our most recent case on the subject, *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374. For the reasons that follow, we hold that it does not, and we therefore reverse the judgment of the court of appeals.

{¶ 10} "The construction of written contracts and instruments of conveyance is a matter of law." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. "Unlike determinations of fact which are given great deference, questions of law are reviewed by a court *de novo*." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684, 686; *Ohio Bell Tel. Co. v. Pub. Util. Com.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286, 287.

{¶ 11} The purpose of contract construction is to discover and effectuate the intent of the parties. *Skivolocki*, at paragraph one of the syllabus. The intent of the parties is presumed to reside in the language they chose to use in their agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning. *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499, 501. Finally, a contract is to be construed against the party who drew it. *Cent. Realty Co. v. Clutter* (1980), 62 Ohio St.2d 411, 16 O.O.3d 441, 406 N.E.2d 515.

**{¶ 12}** The reservation clauses in the two deeds drafted by Cambria are substantially the same. It is the language of these clauses that we must examine to determine the intent of the parties. The reservation clause of the 1955 deed provides:

"There is reserved and excepted from this conveyance all of the minerals of whatsoever nature and description, including oil, gas and salt water together with the right and privilege of entering in, on, or under said premises for the purpose of exploring for, testing, mining and removing the same, and of making, constructing, driving, opening and maintaining any entries, passages, airways, shafts or slopes thereon and thereunder, or for drilling for and producing oil, gas, or salt water or their constituents thereof, with the right to enter in and upon said premises, place and use proper equipment for drilling outlets for mine water, and the rights to occupy that portion of said surface necessary for said shafts, slopes, tanks and/or pipe lines and the right to convey and/or transport any or all of said minerals contained in and under said lands, on, in and under adjacent lands in, on or under said demised premises, except that any damage caused to fences and/or growing crops caused by such entry and transportation of said minerals shall be paid for by said Grantor, its successors, assigns and/or lessees.

"Grantee, for herself, her heirs, successors and assigns, covenants and agrees that in the event it becomes advisable and/or necessary for Grantor, its successors or assigns, to use and occupy any of the surface of said demised premises, not to exceed 5 acres in extent,[1] for the purpose of the installation of a mine plant or facilities in connection therewith, then and in that event said Grantee, her heirs, successors and assigns, will sell and convey to Grantor, its successors or assigns, said surface acreage for the price of fifty dollars ($50.00) per acre, plus the additional cost of any improvements or additions made and placed on said surface by Grantee, her heirs, successors or assigns.

---

1. The April 2, 1962 deed does not contain this acreage limitation, though the discrepancy does not bear on our holding.

"Grantor, its successors and/or assigns, shall be held harmless and without liability for any injury or damage that may occur to the surface of said demised premises or to any buildings, wells, springs or improvements now or hereafter placed or erected thereon by reason of the mining, removing and/or transporting of any or all minerals in, on or under said demised premises, or damage resulting from drainage of mine water."  (Footnote added.)

{¶ 13} The syllabus of *Skivolocki* reads:

"1.    Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.

"2.    The right to strip mine for coal is not implicit in the ownership of a severed, mineral estate.

"3.    A deed which severs a mineral estate from a surface estate, and which conveys the right to use the surface incident to mining coal, in language peculiarly applicable to deep mining techniques, does not grant the right to remove coal by strip mining methods."

{¶ 14} The issue in *Skivolocki* was the same as that before the court today, though the technological context in the mining industry at the time of drafting of the deeds was different.  The court of appeals below found the difference to be critical.  We, however, do not.

{¶ 15} In *Skivolocki*, the successor in interest to the mineral estate sought the right to strip-mine the land in question over the objection of the surface owner. The deed severing the estates vested the mineral owner with rights to all the coal on the land.  The mineral owner argued that the right to remove the coal included the right to remove it by strip mining.  We held that the right to strip-mine for coal is not implicit in the ownership of a severed mineral estate, and that a deed severing the estates, conveying the right to use the surface incident to coal mining, using language peculiarly applicable to deep mining, does not grant the right to strip-mine. *Skivolocki*, at paragraphs two and three of the syllabus.

**{¶ 16}** In reaching our decision here, we rely on a long line of Ohio coal cases originating with *Burgner v. Humphrey* (1884), 41 Ohio St. 340. Though *Burgner* predated the advent of strip mining, it stated a principle which we have held applicable to the strip-mining issues of today. When the mineral and surface interests in a tract of land are severed so that use can be made of the same land by different parties, and the land is thereby rendered doubly productive, the surface owner has an unequivocal right to the integrity of the surface. *Burgner*, *supra*, at 352. The actions of the mineral owner are limited by the obligation not to destroy or damage the surface estate unless a release from that obligation is expressly included in the deed or contract. Id. at 353.

**{¶ 17}** In *Skivolocki* we stated, "Because strip mining is totally incompatible with the enjoyment of a surface estate, a heavy burden rests upon the party seeking to demonstrate that such a right exists." *Skivolocki*, 38 Ohio St.2d at 251, 67 O.O.2d at 325, 313 N.E.2d at 378. One line of *dictum* following this quotation, however, appears to have generated confusion. We added, "This is *especially* true when the deed relied upon was executed prior to the time strip mining techniques became widely employed." (Emphasis added.) *Id*. at 251, 67 O.O.2d at 325, 313 N.E.2d at 378-379.

**{¶ 18}** The court of appeals relied, at least in part, on this dictum for its conclusion that the parties intended to reserve to Cambria (and its successors) the right to enter and strip the surface estate purchased by Helen Holmes as an incident of its ownership of the mineral rights. We find the appellate court's reliance to have been misplaced.

**{¶ 19}** Though it may be *especially* true that mineral reservation clauses written exclusively in terms of deep mining and drafted before the development of strip-mining, cannot be presumed to include the right to strip-mine, it does not follow that the right to strip-mine must be presumed if the reservation clause was drafted after development of the technology. Such reasoning could only be based

on the untenable presumption that, despite the absence of explicit language, if strip mining was generally known at the time of drafting, it is probable that the parties intended the mining rights to include the right to strip-mine. To state the proposition, however, is to discredit it. We find it unlikely that any purchaser of a surface estate would buy the surface of a tract subject to the right of the mineral owner to destroy the surface at its pleasure. For us to impose such a presumption would truly be turning the proclivities of human nature on their head.

{¶ 20} "'Where the language of a contract *** is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.'" *Stewart v. Chernicky* (1970), 439 Pa. 43, 49-50, 266 A.2d 259, 263 (finding no right to strip-mine).

{¶ 21} For the same reason, we find Drydock's contention that "all means all" (*i.e.*, ownership of all the coal along with the right to remove it gives the mineral owner the right to extract the coal by any convenient means, no matter how destructive to the surface estate) equally unpersuasive.

{¶ 22} The deeds in this case express the clear expectation by both parties that the surface of the land will be used for farming, as it had been prior to the severance of the interests and as it has continued to be for forty years. Specific provision is made within the reservation clauses for damages payable to the surface owners for destruction of crops and fences by the mineral owners. Such provisions would hardly be necessary if the deeds reserved to the mineral owner the right to remove the entire surface of the land by strip mining. And, as we noted in *Skivolocki*, strip mining is entirely incompatible with the enjoyment of a surface estate. *Skivolocki* at 251, 67 O.O.2d at 325, 313 N.E.2d at 378.

{¶ 23} Further, the reservation clauses provide for the use of the surface for the installation of a mine plant or facilities and for roads permitting the transport of

mining equipment and vehicles from extraction points to the border of the property. Again, it would be unnecessary to make such a reservation if the mineral estate included the right to operate machinery everywhere on the property whose purpose is to scrape away the entire surface in pursuit of shallow veins of coal. Examples of provisions in the deeds which pertain only to deep mining and make sense only in that context are legion. In contrast, the deeds contain neither an express provision authorizing strip mining, nor any provision even suggesting that strip mining was intended. These facts in themselves would be sufficient to support our holding under *Skivolocki.*

{¶ 24} Drydock urges, however, that we adopt the other grounds relied upon by the court of appeals for its decision. First, the dictionary definition of "mining" at the time the deeds were drafted included strip mining. Second, the surface interest in this case was severed from the fee as opposed to the mineral interest being severed from the fee. We find neither argument persuasive as to the intent of the parties.

{¶ 25} Though strip mining is undeniably a form of mining, and the deeds reserved to Cambria the right to mine and remove all the coal and other minerals, we find the dictionary definition to be far outweighed in our search for the intent of the parties by the weight of the deep-mining context and language of the reservation clauses and by the patent incompatibility of strip mining with separate ownership of the surface of the land.

{¶ 26} Neither do we agree that the determination of the intent of the parties should be made according to whether the surface interest or the mineral interest is severed from the fee. Though the court of appeals described the difference as "critical," we have not discovered any authority in support of that contention. The second syllabus paragraph of *Skivolocki* does not differentiate between the two situations; rather, it speaks in terms applicable to both.

**{¶ 27}** Indeed, in *Burgner*, we long ago stated that the "obligation to protect the superincumbent soil, exists whether there is a conveyance of the surface reserving the minerals, or a grant of the minerals, without a conveyance of the surface. In either case, the presumption arises, that the owner of the minerals is not, by removing them wholly or in part, to injure the owner of the soil above." *Burgner*, 41 Ohio St. at 352-353. The principle applies equally to the present case. Though Drydock owns all the coal and minerals on the property and clearly is entitled to extract them, what it may not do is extract them by means of a technique that destroys the estate sold by its predecessor in interest to another.

**{¶ 28}** We note also that our holding in this case is consistent with the rules adopted in the other coal-mining jurisdictions to have considered the question. Drydock points to *Bellville Mining Co. v. United States* (C.A.6, 1993), 999 F.2d 989, a federal Sixth Circuit case construing Ohio law, for the proposition that deeds drafted after strip mining became widely known and used should be interpreted to include the right to strip-mine along with the mineral owner's right to deep-mine for coal. Appellee mischaracterizes the court's holding. In fact, the court held that the intent of the parties is controlling, and that when deep-mining language is used exclusively, courts must assume that strip mining was not intended. *Id.* at 993-994.

**{¶ 29}** The courts of Pennsylvania, West Virginia, Virginia, Missouri, Colorado and Texas have all adopted the rule we state today using such language as: "[W]hen a grantor, as in this case, sells the surface of the land, he knows that the use of it for farming and other purposes is contemplated and assents thereto. *** [I]f he desires to reserve rights inconsistent with the full enjoyment of the surface, it is his duty to reserve those rights by clear and unequivocal language. It is hardly to be supposed that either the grantor or the grantee *** for a moment contemplated the reservation of a right which would enable the grantor to totally destroy the subject matter of the conveyance.***" *Stonegap Colliery Co. v. Hamilton* (1916), 119 Va. 271, 292, 89 S.E. 305, 311. "'[I]n view of the surface

violence, destruction and disfiguration which inevitably attend strip or open mining, *** no land owner would lightly or casually grant strip mining rights, nor would any purchaser of land treat lightly any reservation of mining rights which would permit the grantor or his assignee to come upon his land and turn it into a battle-ground with strip mining'. *** Therefore, 'the burden rests upon him who seeks to assert the right to destroy or injure the surface' *** to show some positive indication that the parties to the deed agreed to authorize practices which may result in these consequences." (Citations omitted.) *Stewart v. Chernicky*, 439 Pa. at 50, 266 A.2d at 263. See, also *Phipps Leftwich* (1976), 216 Va. 706, 222 S.E.2d 536; *Groves v. Terrace Mining Co.* (Mo. 1960), 340 S.W.2d 708; *Smith v. Moore* (1970), 172 Colo. 440; 474 P.2d 794; *Acker v. Guinn* (Tex. 1971), 464 S.W.2d 348; *West Virginia-Pittsburgh Coal Co. v. Strong* (1947), 129 W.Va. 832, 42 S.E.2d 46.

**{¶ 30}** Thus we hold that a deed which severs a mineral estate from a surface estate, and which grants or reserves the right to use the surface incident to mining coal, in language peculiarly applicable to deep-mining techniques, whether drafted before or after the advent of strip mining, does not grant or reserve to the mineral owner the right to remove coal by strip-mining methods.

**{¶ 31}** In view of our holding it is unnecessary to determine whether the contract at issue is ambiguous such that consideration of extrinsic evidence would be appropriate. The trial court found the extrinsic evidence to be cumulative, indicating that strip mining was not intended. The court of appeals found the contract unambiguous and did not consider extrinsic evidence. As the extrinsic evidence adduced at trial clearly indicated absence of intent to allow strip mining, our consideration of the extrinsic evidence would have no bearing on our conclusion that the parties to the original deeds did not intend Cambria to have reserved strip-mining rights.

**{¶ 32}** Last, we agree with *amici* Ohio Farm Bureau Federation and Ohio Mining and Reclamation Association, both of whom filed briefs urging reversal, that

our decision today will promote judicial economy and avoid confusion in the drafting and interpretation of deeds severing mineral and surface rights. The large number of extant deeds with similar reservation clauses would be subject to a multitude of unnecessary litigation in order to clarify respective rights in the absence of the clear rule we announce today.

{¶ 33} Accordingly, the judgment of the court of appeals is reversed, and the judgment of the court of common pleas is reinstated.

*Judgment reversed.*

DOUGLAS, POWELL, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK, J., dissents.

STEPHEN W. POWELL, J., of the Twelfth Appellate District, sitting for WRIGHT, J.

_____

**COOK, J., dissenting.**

{¶ 34} I respectfully disagree with the decision of the majority because I agree with the court of appeals that *Skivolocki* does not dictate the result in this case.

{¶ 35} The majority cites *Skivolocki* language, reasoning that "'strip mining is totally incompatible with the enjoyment of a surface estate,'" and thus "'a heavy burden rests upon the party seeking to demonstrate that such a right exists.'" That balancing of the agricultural use of property against the total destruction of such uses by strip mining played an important part in the *Skivolocki* decision. The instant case differs in that here we have a challenge between the lessee of the surface estate, whose lease permits strip mining, and the owner of the mineral estate, which also claims the right to strip-mine.

{¶ 36} The court of appeals analyzed this case "in a manner consistent with well-established contract law." Given the plain meaning of the language of the deeds, the appeals court concluded, and I agree, that Drydock reserved the right to

surface-mine. The deeds provide that Drydock continues to own "all of the minerals of whatsoever nature and description" and may enter "in, on or under said premises for the purpose of *** mining and removing the same***." Moreover, as cited by the appellate court, the dictionary definition of "mining" at the time the deeds were executed included the method of surface mining.

{¶ 37} Although the majority seems to be persuaded by the unassailable proposition that it is unlikely that any purchaser of a surface estate would buy the surface of a tract subject to the right of the mineral owner to destroy that surface, the concurring opinion of Judge Grey of the court of appeals poses the equally sound question as to whether any reasonable person would reserve a mineral interest but not the right to recover the minerals. Today's decision results in Drydock owning the coal but with no right to mine it and Graham having the right to mine it but no ownership.

{¶ 38} I therefore would affirm the judgment of the court of appeals based on the language of the reservation clauses in the deeds.

————————————