**MAVERICK OIL GAS, INC., Appellant and Cross–Appellee,**

v.

**BOARD OF EDUCATION OF BARBERTON CITY SCHOOL DISTRICT et al., Appellees and Cross–Appellants.**

[Cite as *Maverick Oil & Gas, Inc. v. Barberton City School Dist. Bd. of Edn.*, 171 Ohio App.3d 605, 2007-Ohio-1682.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 23371.

Decided April 11, 2007.

606

Kenneth L. Gibson, for appellant and cross-appellee.

David Kane Smith, Michael E. Stinn, and Christian M. Williams, for appellees and cross-appellants.

BAIRD, Judge.

{¶ 1} Appellant and cross-appellee, Maverick Oil & Gas, Inc., and appellee and cross-appellant, Barberton City School District, appeal from the judgment of the Summit County Court of Common Pleas denying a permanent injunction against appellee and denying appellee's counterclaim for monetary damages. We affirm in part and reverse in part.

I

{¶ 2} Dale Van Hyning owned a tract of land in the city of Norton. In 1981, he conveyed an oil-and-gas leasehold to Appalachian Exploration, Inc. ("Appalachian"). The lease named Dale and Edith Van Hyning, Russell H. Van Hyning, and Howard Van Hyning as lessors. The lease, which was recorded, gave Appalachian the right to:

transport by pipelines or otherwise across [the property] oils, gas and their constituents from the subject and other lands * * * and [to place on the property] tanks, equipment, roads and structures * * * to procure and operate for the said products * * *.

{¶ 3} Van Hyning sold the surface rights to appellee in 1998, reserving all oil and gas rights. The deed of conveyance provided:

Except as may be required for emergency servicing, maintenance or repair, Grantor agrees to give prior written notice of all entries to the Grantee at least 48 hours in advance of such servicing [of the oil wells] or provide Grantee with

a schedule of routine servicing. Upon completion of any servicing, maintenance or repair, the Grantor shall repair any damage done to the Property and shall restore the same as near as possible to its condition prior to Grantor's entry.

It is understood that Grantor is obligated under a lease with Resource Energy, Inc. (successor by reason of assignment from Appalachian Exploration, Inc.) as originally recorded in volume 6475, page 430 of the Summit County Records. Grantor agrees to use best efforts to have his lessee comply with the terms of this reservation and further agrees to negotiate to incorporate these requirements in any future leases.

{¶ 4} Sometime after the sale, Dale Van Hyning conveyed his interest in the oil and gas rights to his son, Alan Van Hyning. Dale Van Hyning later died. In the meantime, appellee built a sports complex on the property for use by the school district and the general public. By this time, three oil and gas wells had been drilled on the property, known as Van Hyning No. 1, Van Hyning No. 2, and Van Hyning No. 3 ("Well 1," "Well 2," and "Well 3," respectively). After appellee purchased the land, Well 3 was capped and a baseball diamond was constructed on the site.[1] Appellee also prepared a path to be used as both a nature trail and a track for the school's cross-country team. Part of the track was made from preexisting access paths that had been used for maintaining Well 2.

{¶ 5} In February 2004, the lease of Well 2 was assigned to appellant. Well 2 had fallen into disrepair and was no longer operational, and appellant began installing replacement equipment and repairing the existing equipment to restore the well to working condition. As a result of this work, trucks and heavy equipment frequently accessed the well site via the cross-country tracks.

{¶ 6} In April 2004, after observing appellant's activity on the property, appellee's attorney contacted appellant requesting proof of appellant's right to be on the property. Appellant forwarded to appellee a copy of the assignment instrument. Appellee complained that the work vehicles were damaging the cross-country track and asked appellant to repair the resulting ruts. Appellant claims that it made several attempts at these repairs, but that initial efforts were delayed by the wet, muddy ground and that appellee removed the stones that appellant had used to fill in the ruts. Eventually, appellee installed a series of bollards, or short, thick posts, with a cable strung between them, to restrict vehicular access to the well head. Although the cable could be unlocked, allowing vehicles to pass, appellant was informed that it would only be given a key if it

---

1. The deed of conveyance included a provision that Well 2 would be capped after the conveyance, but it is undisputed that Well 3 was actually capped and that the parties to the conveyance intended for Well 3 to be capped rather than Well 2.

repaired the tire ruts on the property. Appellant responded that other vehicles sometimes accessed the property and said that the school should monitor the paths to see whether vehicles other than those servicing the well were causing the damage. With the bollards in place and the only access key in appellee's possession, appellee requested that appellant provide advance notice before bringing service vehicles to Well 2, pursuant to the notice provision in the conveyance from Dale Van Hyning to appellee.

{¶ 7} Appellee hired Kustom Fencing, Inc. to repair the ground damage, just in time for the start of the 2004 cross-country season. Kustom Fencing also installed a chain-link fence around appellant's storage tank, at appellee's request and without appellant's knowledge, in order to keep children away from the high-voltage equipment located at the tank battery site, about 1,000 feet away from the well itself. Appellant was required by Norton City Code 848.27(a) to install such a fence no later than six months after the setting of the storage tanks, and the lease required a fence to be installed at the well site "when completed." Appellant's newly installed storage tank was defective, however, and when a replacement tank was delivered after the fence was installed, appellant had to rent two cranes to hoist the tanks over the fence.

{¶ 8} Appellant filed suit seeking a permanent injunction to prevent appellee from restricting appellant's vehicular access to the oil well.[2] Appellee counter-claimed for money damages resulting from the repair of the tire ruts and the installation of the chain-link fence around the tank battery. A bench trial was held, and the trial court denied the request for injunctive relief, holding that appellant was subject to the notice provision in the deed conveying the property to appellee. The court also stated that it could not determine the exact amount of damages claimed by appellee and denied the counterclaim on that basis. Appellant filed this appeal, raising two assignments of error, and appellee cross-appealed, raising one assignment of error.

## II

### A

### First Assignment of Error

The trial court erred in determining that a subsequently filed deed can as a matter of law alter the rights of a lessor under an existing oil & gas lease which

---

2. Kustom Fencing, Inc. and Cavanaugh Building Corporation were also named as defendants in the original complaint. Appellant alleged that Cavanaugh had negligently cut power lines leading to the well heads while performing work near the site and that Kustom Fencing had negligently punctured a pipe while installing the fence. Both of these defendants were voluntarily dismissed prior to trial.

had been filed of record and of which the purchaser under the deed had actual notice.

{¶ 9} Appellant argues in his first assignment of error that the trial court erroneously found, as a matter of law, that a subsequent deed could alter the rights of a lessor and lessee under a prior lease. After reviewing the trial court's journal entry, it appears to this court that the trial court failed to recognize the effect of the 1981 oil and gas lease altogether and thereby erroneously found that the deed altered the rights established under the lease.

{¶ 10} The parties presented undisputed evidence at trial, in the form of testimony and documentary exhibits, to show that the original oil and gas lease was executed in 1981. In 1998, Dale Van Hyning conveyed the surface rights to appellee, including the right to receive advance notice prior to accessing the property. Van Hyning reserved the oil and gas rights, presumably to continue receiving oil and gas royalties and to retain control over future leases in case the existing lease terminated at some point in the future. The conveyance to appellee was specifically made subject to the existing lease. The 1981 lease was assigned to appellant in 2004, conveying all the rights contained in the lease to appellant. Regardless of what other factual disputes may have existed between the parties, there was no question at trial as to when the lease was executed, when it was assigned, and when the deed was executed from Dale Van Hyning to appellee. Both parties reiterated this sequence of events in their appellate briefs.

{¶ 11} The trial court found that after the property was conveyed to appellee, "[t]he oil and gas reservation in the deed was later transferred to [appellant] who owned their rights." To the contrary, the only transfer of the reserved oil and gas rights after appellee bought the property was a transfer from Dale Van Hyning to his son Alan, not to appellant. Appellant was a party only to the assignment of the 1981 lease, and although the assignment was executed after the deed, the lease was executed many years before the deed. The trial court did not even discuss this lease in its journal entry, apparently finding that appellant had become subject to the 48–hour notice requirement in the deed of conveyance by virtue of a subsequent transaction between appellant and appellee. There is no evidence in the record of such a transaction.

{¶ 12} An oil and gas lease is governed by contract law. *Harris v. Ohio Oil Co.* (1897), 57 Ohio St. 118, 129, 48 N.E. 502. An appellate court reviews questions of contract construction de novo. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949. "The purpose of contract construction is to discover and effectuate the intent of the parties. The intent of the parties is presumed to reside in the language they chose to use in their agreement." (Citation omitted.) Id.

{¶ 13} An oil and gas lease also creates a limited property right, such that the lessee has the right to possess the land to the extent reasonably necessary to perform the terms of the lease on his part. *Harris*, 57 Ohio St. at 129–130, 48 N.E. 502. It is well settled that when a grantor transfers an interest in real estate and the transfer is recorded, the grantor may only convey his remaining interest to a subsequent grantee and nothing more. *Shields v. Titus* (1889), 46 Ohio St. 528, 22 N.E. 717, paragraph one of the syllabus. Thus, where the grantor holds the property subject to a lease that has been previously recorded, the grantee likewise takes the property subject to the lease, and the subsequent transfer has no effect on the prior lease. See id.

{¶ 14} In this case, when Dale Van Hyning executed the gas and oil lease to Appalachian in 1981, he also conveyed to Appalachian a right to place roads on the property to access the oil wells and the tank battery. By the plain language of the lease, Van Hyning expressly reserved the right to approve or disapprove the location of the access roads. He did not, however, reserve the right to block these access roads and demand advance notice before permitting a lessee to use them. Because Van Hyning did not retain the right to restrict the use of the access roads, he could not convey such a right to appellee.

{¶ 15} Appellee further argues that under the terms of the lease, appellant no longer had any right to access Well 2 at the time of the assignment because the leasehold on the access road reverted to the lessor either when installation of the wellhead equipment was completed or when the well first ceased to operate. The lease provides, "All access roads and site clearing other than the final 10 feet × 10 feet at the producing site shall revert to the lessor, either at the completion of a producing well or the abandonment of drilling." Appellee argues that if appellant had a right to access the roads without restriction at any point in time, this right of access reverted to the lessor when the well was completed—i.e., when *construction* was completed—or when the well completed oil and gas production—i.e., when the well ceased to produce oil and gas, albeit temporarily. Appellee therefore contends that appellant's predecessor in the lease no longer had any interest in the roads when the surface rights were conveyed to appellee, and that Dale Van Hyning was able to convey to appellee a right to receive advance notice before any entry onto the property.

{¶ 16} Appellant responds that the contract language is ambiguous in that the term "completion of a producing well" is reasonably susceptible of multiple meanings, and that based on the testimony of Alan Van Hyning, the parties intended for the access roads to revert when the well was permanently closed, not when installation was completed or when the well merely ceased to be used for a period of time.

**{¶ 17}** We agree that the phrase "completion of a producing well" is susceptible to multiple meanings: completion of construction, temporary completion of production, or permanent completion of production. Although a written contract must usually be construed according to the plain meaning of its express terms, extrinsic evidence may be used to determine the parties' intent where the language of the contract is unclear or ambiguous. *Pioneer Gazebo, Inc. v. Buckeye Barns, Inc.*, 169 Ohio App.3d 667, 2006-Ohio-6672, 864 N.E.2d 147, at ¶ 7. Such evidence may include evidence of trade usage within the industry in question. *Standen v. Smith* (Feb. 20, 2002), 9th Dist. No. 01CA007886, 2002 WL 242105 at *6. A contract term is ambiguous if it "can be reasonably understood in more than one sense." *Pioneer Gazebo*, supra at ¶ 7, quoting *Watkins v. Williams*, 9th Dist. No. 22162, 2004-Ohio-7171, at ¶ 24. In this case, the contract language indicating that the leasehold would revert at "the completion of a producing well" could reasonably mean that the leasehold would revert when *installation* was completed, when *oil and gas production* were completed—even if the well remained capable of being returned to service—or when oil and gas production were *permanently* completed.

**{¶ 18}** Because of this ambiguity, appellant urges the court to consider the testimony of three individuals as a guide to interpreting the meaning of the lease agreement. The first witness was Alan Van Hyning, who testified that he was a signatory to the 1981 lease agreement and that the parties to the agreement did not intend for the access roads to revert until the well was permanently closed.[3] The other witnesses were Brian Carr, appellant's president, and Robert Rufener, a self-employed oil-well tender who serviced the well under a contractual arrangement with appellant. Both of these witnesses testified that they had never heard of a landowner requiring advance notice before allowing lessees under oil leases to access their wells and that full access is necessary and customary in the industry to allow for emergency maintenance and for irregularities in the schedules of well-service personnel.

**{¶ 19}** Although contract interpretation is normally a question of law, it becomes a question of fact when an ambiguous term necessitates the introduction of extrinsic evidence to interpret the contract. *Rongone v. Ohio Mach. Tool & Design, Inc.* (Mar. 13, 1991), 9th Dist. No 14706, 1991 WL 35101, at *2. Because the terms of the lease agreement regarding the "completion of a producing well" are ambiguous and the trial court apparently failed to consider this language at all, we must sustain appellant's first assignment of error and remand the case to

---

3. Surprisingly, Alan Van Hyning claimed to have signed the lease—and appellant continues to assert this fact—even though Van Hyning's name does not appear anywhere on the lease. He does not appear to have had any interest in the property until his father transferred the oil rights to him after the 1998 conveyance to appellee.

the trial court to determine the meaning of the terms and whether appellant's right to access the roads reverted to the Van Hynings or their successors in title after construction was completed or after the well temporarily ceased production, or whether it will revert only when the well is permanently closed.

### B

### Second Assignment of Error

The trial court erred in denying injunctive relief to the appellant to protect its right of access to its equipment.

{¶ 20} Appellant's second assignment of error relates to the nature of the remedy available to appellant if, under the terms of the lease, appellant has the right to use the access roads without interference. Because the trial court has yet to determine appellant's rights on remand, we are unable at this stage to determine what remedies, if any, are available to appellant. Therefore, the issue is not ripe for review, and we decline to address the second assignment of error. See *Gilbert v. WNIR 100 FM* (2001), 142 Ohio App.3d 725, 747, 756 N.E.2d 1263.

### C

### Appellee's Cross–Assignment of Error

The trial court erred in dismissing the board's counterclaim. The trial court's ruling is against the manifest weight of the evidence as the board proved the damages it sustained because of (1) the damage Maverick Oil caused to its property and (2) Maverick Oil's failure to install a fence around the tank battery as required by the Norton Planning Commission.

{¶ 21} Appellee contends that the trial court's refusal to award damages for its counterclaim was contrary to the manifest weight of the evidence. The trial court stated in its order that it could not determine the exact amount of damages owed to appellee and found in favor of appellant on that basis.

{¶ 22} This court applies the same manifest weight analysis in both criminal and civil cases. *Ray v. Vansickle* (Oct. 14, 1998), 9th Dist. Nos. 97CA006897 and 97CA006907, 1998 WL 716930, at *1. This requires the appellate court to:

"review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." Id., quoting *State v. Otten* (1986), 33 Ohio App.3d 339, 515 N.E.2d 1009, paragraph one of the syllabus.

{¶ 23} As to the installation of the new fence, appellee premises this portion of its cross-appeal entirely on an unjust enrichment claim. Appellee did not raise this theory of recovery in its counterclaim, its amended counterclaim, or the pretrial statement that it filed with the court. Appellee only made a conclusory statement in its proposed findings of fact and conclusions of law—filed *after* the conclusion of the trial—to the effect that appellant could not benefit from appellee installing the fence at its own expense when appellant failed to do so in a timely fashion. From the context of the amended counterclaim, all claims relating to the installation of the fence appeared to be more in the nature of an action for trespass. "A complainant has an obligation to assert all theories of recovery for a single debt owed in the same cause of action. Failure to do so results in that remedy being forever waived." *Fort Jennings State Bank v. Roof* (Aug. 2, 1988), 3d Dist. No. 12–86–5, 1988 WL 80525, at *4. While the trial judge did not consider the claim of unjust enrichment, he was not required to consider the claim as it was not raised before trial.

{¶ 24} In any case, a claim for unjust enrichment requires the claimant to show that a benefit was conferred upon another party, that the other party knew of the benefit, and that it would be unjust to allow the other party to retain the benefit without paying for it. *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, at ¶ 20. Appellant's president, Brian Carr, testified at trial that he had no knowledge of the fence being installed until after it had already been installed. Appellee has introduced no contrary evidence to satisfy its burden. Thus, even if an unjust enrichment claim had been properly raised, the trial judge could not reasonably have found that appellee was entitled to restitution for unjust enrichment for the installation of the fence.

{¶ 25} As to the property damage, testimony from multiple witnesses indicated that vehicles other than those belonging to appellant and appellant's contractors sometimes used the access roads. There was no testimony to indicate that all of the damages claimed by appellee were attributable to appellant; therefore the trial judge could have found that appellee did not meet its burden of showing what portion of the damage to appellee's property, if any, resulted from appellant's activity.

{¶ 26} Based on the evidence, the trial judge did not lose his way in determining that appellee was not entitled to recover damages from appellant under the counterclaim. Appellee's cross-assignment of error is overruled.

III

{¶ 27} Appellant's first assignment of error is sustained. The second assignment of error is not addressed as being unripe. Appellee's cross-assignment of

error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this decision.

Judgment affirmed in part
and reversed in part,
and cause remanded.

SLABY, P.J., and CARR, J., concur.

WILLIAM R. BAIRD, J., retired, of the Ninth Appellate District, sitting by assignment.