[Cite as *Aqua Ohio, Inc. v. Allied Indus. Dev. Corp., Inc.*, 2014-Ohio-1473.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| AQUA OHIO, INC., | ) | |
| | ) | CASE NO.    13 MA 85 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| ALLIED INDUSTRIAL DEVELOPMENT | ) | |
| CORPORATION, INC., et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Common Pleas Court, Case No. 12CV722.

JUDGMENT: Affirmed.

APPEARANCES:
For Plaintiff-Appellee: Attorney James Blomstrom
Attorney Matthew Vansuch
26 Market Street, Suite 1200
Youngstown, Ohio  44503

For Defendant-Appellant: Attorney Kathryn Vadas
Attorney Kevin Bradford
6550 Seville Drive, Suite B
Canfield, Ohio  44406

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated:  March 31, 2014

VUKOVICH, J.

{¶1}   Defendants-appellants Allied Industrial Development Corporation, Inc. and Allied Erecting and Dismantling Co., Inc. (Allied) appeal the decision of the Mahoning County Common Pleas Court granting plaintiffs-appellees Aqua Ohio, Inc.'s motion for Judgment Notwithstanding the Verdict (JNOV).   In granting the JNOV, the trial court determined that the language of the 1913 contract, which is at the core of this lawsuit, does not require Aqua to remove the pipeline and does not provide for damages for failing to remove the pipeline.   For the reasons expressed below, that legal interpretation of the 1913 contract is proper and sound.   Therefore, the judgment of the trial court is hereby affirmed.

Statement of the Case

{¶2}   In 1913, The Lake Erie and Eastern Railroad Company and Mahoning Valley Water Company entered into a contract which allowed the water company to lay an 18 inch waterline across the railroad company's land.   The pipeline was thereafter laid.

{¶3}   Mahoning Valley Water Company later dissolved and Ohio Water Company assumed the rights, responsibilities, and obligations under the contract. The water company is Aqua Ohio's predecessor in interest and the railroad is Allied's predecessor in interest.

{¶4}   Allied has been acquiring land between the Mahoning River and Poland Avenue since the early 1970s and now owns over 200 acres in this area.   This land, or portions of it, are considered a brownfield and Allied is in the process of reclaiming this area by removing so many feet of earth and refilling it with "clean" earth; its plan is to remediate this area and create a "Foreign Trade Zone."

{¶5}   In 1994, Allied approached Ohio Water about this 18 inch crossover waterline. Allied was of the position that the waterline interfered with its plans for the property and that Ohio Water needed to and was required to relocate the line. Negotiations occurred but eventually broke down and the issue was not resolved.

{¶6}   It appears from the record that around that time the waterline began leaking and was flooding portions of Allied's property.   In 1994 and 1996, Allied

complained to Ohio Water and Aqua Ohio of this problem. Allegedly nothing was done to repair the waterline at that point. In 2000, Norfolk and Southern Railroad complained to Aqua Ohio about the leaking water because it was flooding portions of its land. In December 2000, the valve was shut off and no water was transported through the line.

{¶7} Sometime in 2009, Allied contacted Aqua Ohio and asked for the location of this waterline. Aqua Ohio provided Allied with a schematic of where the waterline was located. However, the schematic did not indicate at what depth the waterline was located. It appears that Allied wanted Aqua Ohio to come out to the site and indicate exactly where the line was located and at what depth. Allied wanted this information because it was in the process of remediating the land and it did not want to dig up the waterline and damage it; it was afraid of potential liability.

{¶8} Thereafter, Allied contacted Aqua Ohio about the waterline, requesting permission to remove it. At the end of 2010 or in the beginning of 2011, Aqua Ohio informed Allied that Allied could remove the line, but that Aqua Ohio was not abandoning the easement that was created by the 1913 contract. This was unacceptable to Allied. Allied did not believe that the 1913 contract created an easement and it was of the position that even if it did, it wanted Aqua Ohio to relinquish that easement. Due to the language used in a letter granting permission to Allied to remove the waterline, Allied refused to remove the line. Instead, it appears that the parties attempted to negotiate about relocating this waterline. However, negotiations reached an impasse.

{¶9} Aqua Ohio wanted to retain this "easement" because it still wanted the ability to transfer water across Allied's property. In fact, it is claimed that at one point Aqua Ohio attempted to come out and repair the waterline. However, Allied would not let Aqua Ohio remain on the property to take such action. This waterline provides access to another waterline that can transport water from Lake McKelvey to Aqua Ohio's potential fracking customers. That lake's water is low in sulfates and is allegedly the type of water needed for fracking.

{¶10} As a result of the above, Aqua Ohio filed a verified complaint against Allied seeking a declaratory judgment that the 1913 agreement created a license

coupled with an interest in favor of Aqua Ohio. 03/09/12 Complaint. Aqua Ohio also sought a temporary restraining order asking for immediate access to Allied's property to repair and reestablish water flow through the waterline. 03/09/12 TRO. The TRO was denied.

{¶11} Allied filed an answer and counterclaim asserting that Aqua Ohio breached the agreement by refusing to relocate the waterline and by failing to maintain it. 03/14/12 Answer and Counterclaim. Aqua Ohio answered the counterclaim. 03/19/12 Answer. Allied then moved to have the trial bifurcated, which was granted.

{¶12} The first jury trial, which dealt with whether the 1913 agreement was a contract and whether it was breached, began on April 11, 2012. Testimony included discussions of the flooding that occurred in the 1990s because of the leaking waterline, that Aqua Ohio would not come out and locate the waterline, and Allied's plans for the property and how the waterline was allegedly interfering with that plan.

{¶13} Three interrogatories were presented to the jury. The first was, "Do you find by a preponderance of the evidence that Plaintiff's Exhibit 1 [1913 Agreement] constitutes an enforceable contract between Mahoning Valley Water Co. and Lake Erie and Eastern Railroad Co.?" All eight jurors agreed that it did. The second interrogatory asked, "Have the Defendants proven by a preponderance of the evidence that Plaintiff, Aqua Ohio, Inc., abandoned its rights under the January, 1913 instrument?" All eight jurors agreed that it did not. The last interrogatory asked, "Have the Defendants, Allied Industrial Development Corporation, Inc. and Allied Erecting and Dismantling Co., Inc., proved by a preponderance of the evidence that Plaintiff, Aqua Ohio, Inc., materially breached the terms of the January 1913 instrument?" Six of the eight jurors answered this question in the affirmative.

{¶14} The second jury trial (a different jury) began on January 7, 2013, to ascertain damages. The testimony offered by Allied focused on September 2010 through the present time and only covered the costs caused by Aqua Ohio's alleged interference with Allied's property by not removing the waterline. The testimony did not indicate what the damages were for the flooding that occurred in the 1990s.

**{¶15}** The jury was instructed that the previous jury had determined that the 1913 agreement was a contract and the Aqua Ohio materially breached it. It was then instructed, "You should consider what damages, if any, were suffered by Allied as a result of the breach for failure to properly maintain the waterline by Aqua Ohio." Two interrogatories were asked. The first was, "Did Aqua Ohio's breach of contract cause Allied damages?" All eight jurors answered this question in the affirmative. The second interrogatory asked, "How did Aqua Ohio breach the contract?" The jurors wrote in the following answer, "Aqua Ohio's failure to maintain and locate the waterline thereby interfering with the development of Allied's property." All eight agreed to this answer. The jurors then filled out the general verdict form for Allied and award Allied $723,111 in damages. This verdict was signed by all eight jurors.

**{¶16}** Following that decision, Aqua Ohio filed a Civ.R. 50 motion for judgment notwithstanding the verdict and, in the alternative, a motion for new trial. Allied opposed these motions. The trial court granted the motion for JNOV and denied the motion for new trial. 05/01/13 J.E.

**{¶17}** Allied timely appeals the order granting the JNOV. Aqua Ohio has filed cross assignments of error claiming, in the alternative, that the trial court erred in denying the motion for a new trial.

<u>Allied's First Assignment of Error</u>

**{¶18}** "The trial court erred in granting Aqua Ohio's motion for Judgment Notwithstanding the Verdict."

**{¶19}** During the damages portion of the trial Allied offered evidence of the costs to work around the waterline in reclaiming the land. Allied claimed that the location of the waterline interfered with its development of the land and that Aqua Ohio was required to the move the line upon Allied's request.

**{¶20}** The damages awarded by the jury were for "Aqua Ohio's failure to maintain and locate the waterline thereby interfering with the development of Allied's property." Answer to Damages Jury Interrogatory Number Two. Thus, the damages awarded by the jury were interference damages.

**{¶21}** Based upon that statement, the evidence offered at trial, and the language in the 1913 agreement, Aqua Ohio moved for a JNOV. It claimed that the

agreement language did not contemplate damages for failing to remove the waterline and/or interfering with the Allied's development of the property.

{¶22} The trial court agreed and granted the JNOV explaining:

The first jury found that Aqua Ohio had breached the contract by failing to maintain the waterline. The damages found in the later trial do not relate to maintenance of the waterline. These damages sought by Defendant and subsequently awarded by the jury relate to location and interference of the waterline in the development of Defendant's land. These damages are not properly awardable under Defendant's counterclaim.

The Court finds that in construing the evidence most strongly in favor of the non-movant, reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to Defendant.

Therefore, the Plaintiff's Motion for Judgment Notwithstanding the Verdict is granted as the evidence is totally insufficient to support the verdict as a matter of law.

05/01/13 J.E.

{¶23} This is a legal determination by the trial court based on the evidence submitted at trial and based on the language of the 1913 agreement.

{¶24} Appellate courts review decisions to grant or deny a motion for JNOV under a de novo standard of review. *Environmental Network Corp. v. Goodman Weiss Miller, LLP*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 22. Thus, we use the same test that the trial court applies when it is determining whether to grant or deny the motion.

{¶25} A motion for JNOV under Civ.R. 50(B) tests the legal sufficiency of the evidence. *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517 at ¶ 25 (a motion for JNOV presents a question of law); *Posin v. A.B.C. Motor Court Hotel, Inc.,* 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976) (motions for JNOV employ the same standard as motions for directed verdict). Thus, when a verdict has been returned for the plaintiff, the trial court, in determining whether to sustain a

motion for judgment notwithstanding the verdict, must decide whether the defendant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the plaintiff. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.,* 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998), citing Civ.R. 50(A)(4). In determining whether to grant or deny a Civ.R. 50(B) motion, the trial court should not weigh the evidence or evaluate the credibility of the witnesses. *Malone v. Courtyard by Marriott,* 74 Ohio St.3d 440, 445, 659 N.E.2d 1242 (1996).

{¶26} In arguing that the JNOV should not have been granted, Allied contends that the 1913 Agreement requires Aqua Ohio to locate and maintain the waterline and that the waterline cannot interfere with Allied's use of the property. It asserts that damages arising from interference are clearly provided for and/or flow from the language of the agreement. According to it, that language means that if Aqua Ohio's waterline interferes with Allied's development of the property, the line must be moved and failure to remove it is a breach of contract.

{¶27} Aqua Ohio disagrees. It asserts that the agreement does not contemplate damages for interference based solely on the location of the waterline.

{¶28} As can be seen by the arguments, whether or not the JNOV should have been granted is dependent upon the language of the 1913 Agreement.

{¶29} It has been explained that contract interpretation is normally a question of law. *Maverick Oil & Gas, Inc. v. Barberton City School Dist. Bd. of Edn.,* 171 Ohio App.3d 605, 872 N.E.2d 322, 2007–Ohio–1682, ¶ 19 (9th Dist.). It only becomes a question of fact when an ambiguous term necessitates the introduction of extrinsic evidence to interpret the contract. *Id.*

{¶30} When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. *Westfield Ins. Group v. Affinia Dev., L.L.C.,* 2012–Ohio–5348, 982 N.E.2d 132, ¶ 21 (5th Dist.). We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St.3d 270, 273 (1999). In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d

146 (1978), paragraph two of the syllabus. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Sunoco, Inc. (R & M) v. Toledo Edison Co.,* 129 Ohio St.3d 397, 2011–Ohio–2720, ¶ 37. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.* citing *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003–Ohio–5849, 797 N.E.2d 1256, ¶ 11. The determination of whether a contract is ambiguous is a question of law. *Salter v. Salter,* 9th Dist. No. 26440, 2013–Ohio–559 at ¶ 6. If the terms of the contract are clear and unambiguous, the interpretation of the language is a question of law, which we review de novo. *State ex rel. Parsons v. Fleming,* 68 Ohio St.3d 509, 511, 1994–Ohio–172, 628 N.E.2d 1377.

**{¶31}** The language of the 1913 contract provides:

KNOW ALL MEN BY THESE PRESENTS, that THE LAKE ERIE AND EASTERN RAILROAD COMPANY, in consideration of ONE DOLLAR, and for valuable considerations to it moving, received to its full satisfaction from THE MAHONING VALLEY WATER COMPANY, the receipt whereof is hereby acknowledged, does hereby GRANT to said Water Company, its successors and assigns, the right to lay down, maintain and use for the purpose of transporting water, a pipe line not exceeding twenty inches in diameter upon the lands owned by the said Railroad Company in the Townships of Coitsville and Youngstown, Mahoning County, Ohio, upon the route indicated on the map hereunto annexed marked "Exhibit A" and made a part hereof, by the line which is colored or shaded in yellow upon the following conditions, to-wit:

FIRST. That said pipe line shall be placed a sufficient depth below the surface of the grade of said ground as such grade is or may be established by said Railroad Company, so as not to interfere with any of the railroad tracks or improvements which said Railroad Company has constructed or may desire to construct upon said lands or any part thereof, and shall be laid in accordance with the prevailing method now employed by railroad engineers in placing water mains under main tracks and protecting the same, and the work of laying,

maintaining and repairing said pipe line by THE MAHONING VALLEY WATER COMPANY, shall be under the supervision and subject to the approval of the work by the Chief Engineer of THE LAKE ERIE AND EASTERN RAILROAD COMPANY.

SECOND. That said the Mahoning Valley Water Company shall conduct the work of laying and repairing said pipe line in such manner as not to interfere with the use or operation of any railroad track or other structures which said Railroad Company may have on said lands, and will indemnify and save harmless said Railroad Company, its successors, lessees and assigns, from any and all expense, loss or liability growing out of the construction, maintenance or operation of said pipe line.

1913 Agreement.

**{¶32}** Allied argues these provisions mean that if at any time the railroad, or Allied, as its successor, determines that the waterline is interfering with the development of the property the waterline must be removed and relocated. Allied even goes as far to insinuate that it must be relocated to a different area that is specified by Allied.

**{¶33}** We disagree with this position. Reading of the contract in the manner Allied suggests ignores the plain language of the contract and is illogical.

**{¶34}** The clear and simple purpose of this agreement is for the water company to run the waterline, but to ensure that the property can be used for railroad purposes. The plain language of this agreement sets forth each party's rights. The water company has the right to lay a waterline at a specific location for the sole purpose of transporting water. The water company has the right to maintain and use that waterline. The railroad company has the right to dictate the engineering methods for placement of the waterline and at what depth the waterline must be located. It likewise has the right to supervise and approve repairs to the waterline. The water company is not permitted to interfere with the use or operation of any railroad track or structure when it is repairing or laying the line. Furthermore, it must hold the railroad company, its successors, lessees and assignees from all expenses,

loss or liability that results from the construction, maintenance or operation of the waterline.

{¶35} Admittedly, the first and second conditions in the contract use the word "interfere." However, the use of the word "interfere" in these provision does not mean that the contract provides for interference damages.

{¶36} The first provision of the agreement discusses at what depth the waterline must be laid. Specifically it must be, "placed a sufficient depth below the surface * * * so as not to interfere with any of the railroad track or improvements which said Railroad Company has constructed or may desire to construct." The primary purpose of this provision is to dictate the initial installation of the pipeline and to ensure that the initial installation does not interfere with the railroad company's plans or use. The railroad is specifically indicating that it has to approve the depth of the line and the laying of the line. The apparent reason for wanting to do so is to ensure that the waterline can withstand any weight that may be placed upon it. Thus, this provision does not provide for damages for alleged interference with the development of the land. Nor does it indicate that if the waterline interferes with some distant future development of the land it must be removed and relocated to an entirely different location.

{¶37} To read this provision otherwise would be illogical. This provision and the preceding introductory paragraph clearly establish where the waterline was to be located. In fact, a map was incorporated into the agreement and on that map the location of the pipeline was specifically identified. This shows the permanency of the geographical location. If the parties were under any belief that the location could be moved at the whim of the railroad, the specific location of the line would not have been set forth in this manner.

{¶38} Turning to the second condition, it is noted that this is a damages provision. This condition states that the laying and repairing of the waterline cannot interfere with the use or operation of the railroad track or other structures the railroad has on the land. It also provides that the water company will "save harmless" the railroad company, its successors, lessees, and assigns, from any and all loss "growing out of the construction, maintenance or operation of said pipe line."

{¶39} The type of damages contemplated in this provision clearly contemplate situations where Aqua Ohio might enter onto the subject property to maintain the line and during the maintenance if Aqua Ohio damages Allied property, Allied would be entitled to damages. Likewise, if during the operation of the line it leaked and flooded the property, Aqua Ohio would be liable for damages. However, the express language does not include a duty to remove or relocate the pipeline to a different geographical area and it does not provide for damages resulting solely from all interference with the usage of the land.

{¶40} Allied would like us to read this contract to mean that when Allied notifies Aqua Ohio that its line is interfering with Allied's current plans, Aqua Ohio breaches the contract if it fails to remove the line and/or relocate it to a different geographical location. It appears to be contending that removal is part of its duty to maintain. We disagree. The word "maintain" is not defined by the agreement, therefore, we must use the ordinary meaning of the word. Maintain means, "To preserve or keep in a given existing condition, as of efficiency or good repair." Webster's II New Riverside University Dictionary 717 (1984). This does not mean relocate or move. As such, we will not read such language into the contract. If we were to read this contract in the manner that Allied advocates it would mean after the railroad approved and oversaw the laying of this waterline, at any time, including just days after the work was complete, it could force the water company to tear out the line because the line "interfered" with plans for the property. This result would be illogical.

{¶41} Therefore, given the plain language of the contract, damages could be awarded for loss resulting only from the improper maintenance, operation and/or use of the water line. The contract does not authorize damages solely for interference with the development of the property. Here, Allied did not present any evidence as to damages resulting from maintenance, operation or use. Instead, Allied asked for damages in the amount of $723,111, the exact amount the jury awarded, for acts that occurred from 2010 on for failing to remove the line because it interfered with Allied's alleged development of the property. At the trial for breach, Allied had offered testimony establishing that when the line was operating in the 1990s it leaked and

caused flooding to Allied and neighboring owner's property. Presumably this resulted in damage to the property. However, during the damages portion of the trial, no evidence was admitted that the operation of the line caused damages to the property; Allied presented no testimony as to what those damages would be, or how the flooding in the 1990s has damaged them now.

**{¶42}** Consequently, since the only evidence as to the amount of damages concerned interference with the development of the property and such damages are not permitted by the contract, there was no basis in law for the award of damages. The trial court's decision to grant the motion for JNOV was proper. This assignment of error lacks merit.

### Second Assignment of Error

**{¶43}** "The trial court abused its discretion in excluding the future labor portion of Anness' expert opinion on damages."

### Aqua Ohio's Conditional Cross Assignments of Error
### One though Four

**{¶44}** "The trial court erred by granting Aqua Ohio's motion for judgment notwithstanding the verdict that reduced Allied's judgment by the amount of the already-incurred labor costs."

**{¶45}** "The trial court erred by not granting Aqua Ohio's motion for judgment notwithstanding the verdict that reduced Allied's judgment by the amount of the future equipment costs."

**{¶46}** "The trial court erred by not granting Aqua Ohio's motion for a new trial on Allied's damages claim."

**{¶47}** "The trial court erred by not granting Aqua Ohio's motion for a new trial on the entirety of Allied's contract counterclaim."

**{¶48}** Our resolution of the first assignment of error renders these assignments of error moot. Thus, they will not be addressed.

### Conclusion

**{¶49}** In conclusion, the JNOV was properly granted. The trial court's legal determination that the agreement does not provide for damages for interference with the development of the property was correct. The contract only provides for

damages which result from the operation, use or maintenance of the waterline. Allied did not present any evidence of damages that resulted from the operation, use or maintenance of the waterline. The only evidence submitted concerned the alleged interference with the development of the property by failing to remove the waterline when Allied asked for it to be removed. Therefore, the trial court correctly determined that reasonable minds could come to but one conclusion on the evidence submitted and that conclusion is adverse to Allied. Thus, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
Waite, J., concurs.