[Cite as *Mineral Dev., Inc. v. SWN Prod. Co., L.L.C.*, 2025-Ohio-395.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

MINERAL DEVELOPMENT, INC.,

Plaintiff-Appellee,

v.

SWN PRODUCTION (OHIO), LLC, et al.,

Defendants-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MO 0013**

---

Civil Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2023-169

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Daniel P. Corcoran*, Theisen Brock, for Plaintiff-Appellee and

*Atty. Sara E. Fanning*, Roetzel & Andress, LPA, and *Atty. Rex W. Miller,* Lesh, Casner & Miller, for Defendant-Appellant Michael W. Shroyer.

Dated:  February 6, 2025

**Robb, P.J.**

{¶1} Defendant-Appellant Michael W. Shroyer appeals the decision of the Monroe County Common Pleas Court granting summary judgment for Plaintiff-Appellee Mineral Development, Inc. on the title claims regarding the oil and gas royalty interest Appellee claims with regards to Appellant's land. Appellant sets forth one assignment of error in which he contends the deed language reserving a fraction of the oil and gas or the royalty "from future wells drilled on these premises" would plainly not apply to a well with the wellhead located on the surface of different premises. Alternatively, Appellant argues extrinsic evidence shows the deed did not intend to cover such wells, as horizontal well technology did not exist at the time of the 1918 deed; if the alleged ambiguity is not resolved by extrinsic evidence, then Appellant cites to a secondary deed construction rule on construing the language against the grantor. If these arguments fail, Appellant asks for a partial reversal so the judgment will only apply to three of the four wells at issue because the fourth well has no laterals entering under the premises subject to the reservation; he claims his pooling and unitization of the premises did not inure to the benefit of the royalty interest.

{¶2} For the following reasons, we conclude a horizontal well traversing beneath the surface plainly qualifies as a well drilled on the premises for purposes of this deed reserving a royalty interest in oil and gas production. Moreover, a landowner's pooling and unitization agreement in a lease does not exclude the royalty interest from lease royalties. Appellant burdened the premises with a lease that provided shared correlative rights from production on all pooled land, agreeing a well on any unitized land will have the same effect as if located on the land subject to the lease. In accordance, even the fourth well, which did not traverse beneath the premises at issue, qualified as a well drilled on the premises to which the royalty interest in oil and gas produced applies. Consequently, Appellant's assignment of error is overruled, and the trial court's judgment is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶3} Appellant acquired approximately 82 acres of land ("the Premises") subject to a reservation owned by Appellee ("the Steiding Interest"). John Steiding owned the

Premises when he entered an oil and gas lease in 1907, prompting the drilling of wells in 1909 and 1911 (wells that are no longer active). When Steiding sold the Premises, the 1918 deed created the Steiding Interest as follows:

> *reserving therefrom* all the oil and gas now or hereafter produced from the wells that are already drilled and *1/16 of oil and gas or 1/2 of the Royalty from future wells drilled on these premises*.

(Emphasis added). (Vol. 86, Pg. 287).[1]

**{¶4}** The record contains the chain of title for the Premises and for the Steiding Interest. As to the Premises, conveyances were recorded in 1941, 1948, 1984, 1988, and 1994. Then, Appellant obtained the Premises along with approximately 100 additional acres in a 1996 deed; an attachment to the deed said the land was subject to all reservations of record without expressly citing to the Steiding Interest. (Vol. 26, Pg. 927). However, the Steiding Interest was recited in prior deeds in Appellant's chain of title, most recently the 1994 deed to the Appellant's immediate predecessor. (Vol. 10, Pg.184).

**{¶5}** In 2012, Appellant entered an oil and gas lease related to his entire 183 acres (including the 82 acres subject to the 1918 deed). The original lessee was the predecessor of SWN Production Company, LLC (a non-appealing defendant). (Vol. 224, Pg. 242) (memorandum of lease recorded Aug. 3, 2012). SWN assigned interests in the lease to two other non-appealing defendants, IOG Resources, LLC and SEG-ECR, LLC nka Sequel Energy Group. The landowner lease royalty was 20% according to the lease terms.

**{¶6}** Two units were created, the Ballpark Unit and the Shroyer Unit. Four oil and gas wells were drilled ("the SWN wells"). The "surface hole locations" of the SWN wells shared a single "surface pad" on land adjacent to the Premises (land Appellant owned that was not subject to the 1918 deed). (Van Sickle Aff. Ex. J). Two horizontal wells were drilled on each unit. The laterals of three of the wells were drilled beneath the Premises (subject to the 1918 deed).

---

[1] As to the pre-existing wells, the 1918 deed's next sentence reads: "In the Event that the wells now drilled are drilled deeper and oil or gas found in Lower Sands, then only one half of the Royalty is reserved under this deed . . ."

**{¶7}** As to the chain of the 1918 Steiding Interest, prior to Appellee's purchase, it was sequentially conveyed through recorded documents in 1936, 1942, 1970, 1974, and 2012. The latter event was the August 30, 2012 recording of a certificate of transfer memorializing Dale McDougal's inheritance of the interest from Bernice J. McDougal (who died intestate in 2000 after obtaining the complete Steiding interest in a 1974 deed). Appellee received the Steiding Interest from Dale McDougal in a deed recorded December 9, 2022. (Vol. 423, Pg. 1213).

**{¶8}** Appellee then contacted the defendant's oil and gas companies requesting to be paid the royalty fraction from the Steiding Interest created in the 1918 deed. Appellee claimed entitlement to 1/2 of the oil and gas royalty, stating the deed's reference to 1/16 (half of 1/8) embodied the expectation that a future lease would provide the standard 1/8 royalty).[2] However, Appellee was then paid only 1/16 of the *lease* royalty payable under the 2012 oil and gas lease (leaving 15/16 payable to Appellant).

**{¶9}** As this was less than the amount Appellee asserted was owed under the terms of the 1918 deed, Appellee filed suit against Appellant and the oil and gas companies (hereinafter "SWN" collectively). (Complaint 7/27/23); (Am. Complaint 1/11/24). The complaint contained claims for declaratory judgment, quiet title, breach of lease, accounting, conversion, and unjust enrichment.

**{¶10}** Appellant filed a counterclaim against Appellee seeking quiet title and a declaration that the Steiding Reservation was limited to production from wells drilled "on" the Premises, which did not cover the SWN wells as they were not drilled on the surface of the property. The counterclaim alternatively claimed the reservation was a life estate that terminated on the death of John Steiding in 1938. Appellant also filed a cross-claim for breach of lease and accounting against his co-defendants for paying royalties to Appellee.

**{¶11}** The trial court issued a scheduling order for dispositive motions on the preliminary matter of title. Appellant and Appellee filed competing motions for summary judgment on the title issues raising various arguments.

---

[2] During pre-suit discussions on keeping the disputed royalty in suspense, Appellant received from SWN the opinion of SWN's own title attorney advising the Steiding Interest should be interpreted as providing a 1/2 non-participating royalty interest. (Min.Dev. S.J. Mot., Corcoran Aff. Ex. A).

{¶12} In pertinent part, Appellant's summary judgment motion argued the plain language of the 1918 deed did not include royalties from wells drilled into the surface of an off-premises location (regardless of where the drill then traveled). He alternatively argued if the language was ambiguous it should be construed in his favor.

{¶13} In response to these arguments, Appellee's competing motion argued the SWN wells were located "on" the Premises under the plain language of the 1918 deed and pointed to the effects of the pooling and unitization clause in Appellant's 2012 lease.[3] Appellee's motion additionally asked the court for a declaration on the applicable fraction and to reject SWN's royalty calculation. SWN did not participate in the summary judgment proceedings.

{¶14} On July 6, 2024, the trial court granted Appellee's motion for summary judgment. In addition to rejecting Appellant's life estate argument, in another holding not contested on appeal, the court rejected SWN's initial calculation (1/16 of a floating lease royalty) and adopted Appellee's calculation (including 1/2 of a floating lease royalty).[4] Most pertinent to this appeal, the court rejected Appellant's argument that Appellee was entitled to zero royalties because the event of "future wells drilled on these premises" referred to in the 1918 deed had not yet occurred because the surface location of the wellbore for each SWN well was not physically located on the Premises.

{¶15} Stating the declaratory judgment on title issues was a final appealable order, the trial court cited Civ.R. 54 and found "there is no just reason for delay." Appellant filed a timely notice of appeal.

---

[3] In response to the life estate argument first set forth in Appellant's counterclaim, Appellee pointed to a recent case where the Supreme Court held the grantors who reserved the royalty interest did not create a life estate terminating on their deaths, even though they failed to use words of inheritance and even though the deed pre-existed the 1925 statute eliminating a common law rule on the need for words of inheritance. *Peppertree Farms, L.L.C. v. Thonen*, 2022-Ohio-395, ¶ 28-29 (because at the time of conveyance, the grantors owned a real property interest in unaccrued royalties from oil and gas production, regardless of whether the property was subject to an oil and gas lease at the time). The trial court rejected Appellant's argument.

[4] The trial court concluded when the 1918 deed was speaking of future production, the phrases "1/16 of the oil and gas" and "1/2 of the Royalty" from future wells drilled on the Premises were used as equivalents (1/16 interest in oil and gas produced is 1/2 of the traditional 1/8 landowner royalty, which was payable under the lease existing at that time). *Citing Moore Family Trust v. Jeffers*, 2023-Ohio-3653 (7th Dist.) (also explaining fixed versus floating perpetual non-participating royalty interests).

## DEED INTERPRETATION PRINCIPLES

**{¶16}** Appellant's arguments presented on appeal all relate to the interpretation of the deed language referring to wells drilled "on" the premises. As set forth in more detail in the next section, Appellant claims the plain language of the word "on" required summary judgment in his favor. He then sets forth the following alternative arguments: his extrinsic evidence showed only vertical drilling existed in 1918; even if parol evidence does not resolve the ambiguity, the language should be construed in favor of his interpretation as the grantee's successor; and one of the four SWN wells should be excluded from any royalty entitlement judgment because its laterals do not travel beneath the Premises, regardless of the pooling and unitization of the Premises resulting in production royalties.

**{¶17}** A court properly grants summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In granting summary judgment, the court must view any evidence submitted under the rule in the light most favorable to the non-movant and find reasonable minds can only come to a conclusion in the movant's favor. *Id.* Here, both parties filed summary judgment motions.

**{¶18}** A summary judgment decision is reviewed de novo. *Bohlen v. Anadarko E & P Onshore, L.L.C.*, 2017-Ohio-4025, ¶ 10. We also review matters of law in a declaratory judgment action de novo. *Arnott v. Arnott*, 2012-Ohio-3208, ¶ 13-16. "The construction of written contracts and instruments of conveyance is a matter of law." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus. And, the construction of a deed is a legal question reviewed de novo just as other contracts and written instruments are so reviewed as a matter of law. *Long Beach Assn., Inc. v. Jones*, 82 Ohio St.3d 574, 576 (1998).

**{¶19}** When the court is tasked with ascertaining the intent of the parties to the deed, it is presumed their intent is expressed by the language employed in the written instrument. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996). Upon viewing the contents of the four corners of the deed, the court must apply the plain and unambiguous language found therein. *LRC Realty, Inc. v. B.E.B. Properties*, 2020-Ohio-3196, ¶ 17. As repeatedly emphasized by the Supreme Court, "If we are able to

determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract." *Saunders v. Mortensen*, 2004-Ohio-24, ¶ 9.

**{¶20}** "Where terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander* at 246. As pointed out by the Supreme Court, words or phrases should not be read in isolation. *Dominish v. Nationwide Ins. Co.*, 2011-Ohio-4102, ¶ 8. "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander* at 245-246 (contract term "alongside of" did not limit the pipeline company to installing only one additional pipeline on each immediate side of the existing pipeline).

**{¶21}** Where a term is legally determined to be ambiguous because its meaning cannot be determined from the four corners of a document, then a "factual determination of intent or reasonableness may be necessary to supply the missing term." *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984). In such case, after the language of a written instrument is found to be ambiguous, parol evidence may be presented to show the parties' intent in order to resolve the ambiguity. *Illinois Controls, Inc. v. Langham*, 70 Ohio St.3d 512, 521 (1994).

**{¶22}** Extrinsic evidence can also be evaluated "when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 76 Ohio St.3d at 313-314. "Although extrinsic evidence of a general custom or trade usage cannot vary the terms of an express contract, such evidence is permissible to show that the parties to a written agreement employed terms having a special meaning within a certain geographic location or a particular trade or industry, not reflected on the face of the agreement." *Alexander*, 53 Ohio St.2d at 248 (finding the words "oil" and "gas" included both the refined and natural states, as the affidavit did not show more limited or special usage of the words were so common as to support a presumption the parties to the pipeline agreement intended such a limit on the future transport of production).

**{¶23}** If parol evidence can be viewed and if it fails to clarify the meaning of a term, only then may a secondary rule of contract construction be applied whereby the language is construed against the drafter. *Corso v. Miser*, 2020-Ohio-5293, ¶ 28 (7th Dist.), citing

*Cadle v. D'Amico*, 2016-Ohio-4747, ¶ 33 (7th Dist.). As applied to a deed reservation, this translates into a construction against the grantor and in favor of the grantee. *Id.*, citing *Pure Oil Co. v. Kindall*, 116 Ohio St. 188, 202-203 (1927) (with the grantor generally regarded as the drafter). Nevertheless, if reasonable minds could differ as to the construction of the term, summary judgment may not be granted. *Inland Refuse Transfer*, 15 Ohio St.3d at 324. "[W]hether a contract is ambiguous is a question of law, but the resolution of an ambiguous term in a contract is a question of fact." *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12, 18-19 (in a case considering extrinsic evidence on special past usage of oil and gas formation terminology, the Supreme Court remanded for trial upon reiterating, "Resolving the meaning of ambiguous terms in a contract is a matter of factual determination for the fact-finder").

{¶24} Still, as the Supreme Court emphasizes, a written instrument is not ambiguous unless its terms are "susceptible to more than one reasonable interpretation." *Corder v. Ohio Edison Co.*, 2024-Ohio-5432, ¶ 14. "The mere fact that a contract's text might be subject to competing interpretations does not mean that the text is ambiguous." *Id.* If one of the competing interpretations of a term in a deed conflicts with the deed's purpose or structure or if it strains ordinary usage, then it cannot be considered reasonable and would not make the deed ambiguous. *Id.*

{¶25} A grantor's reserved royalty interest in minerals is affected by future production, which often occurs after an oil and gas lease is executed by the mineral owner with executive leasing rights, and leases often include pooling and unitization clauses.

> Unitization, pooling, and consolidation all generally refer to the combination of already-leased contiguous tracts of land for purposes of creating a drilling unit. While in practice these terms are used interchangeably, "pooling" technically refers to the joinder of small tracts of land in order to meet the minimum spacing requirements under Ohio law, whereas "unitization" refers to the joint operation of all or a portion of the producing reservoir as a single unit. The purpose of unitization is to permit the drilling unit to be operated as if it were a single parcel.

Baldwin's, *Ohio Practice Real Estate*, § 47:13 (2024) (citing pooling statutes in Chapter 1509).

ASSIGNMENT OF ERROR & ARGUMENTS

{¶26} Appellant's sole assignment of error provides:

"THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT GRANTED SUMMARY JUDGMENT TO APPELLEE ON THE TITLE ISSUES AND FAILED TO GRANT SUMMARY JUDGMENT IN FAVOR OF APPELLANT ON THE TITLE ISSUES."

{¶27} First, Appellant argues the plain language of the Steiding Interest in the 1918 deed reserving a portion of the oil and gas "from future wells drilled on these premises" does not include the SWN wells. Appellant calls the SWN wells "off-premises wells" and concludes wells drilled on neighboring land would not qualify as "wells drilled on" the Premises. He contends a well with an off-premises surface entry location does not transform into "wells drilled on" the Premises merely because the bore travels and produces under the surface of the premises through horizontal drilling, arguing the common definition of "on" relates to placement on top of the surface of something. He concludes the Steiding Interest clearly does not encompass a well whose surface drilling site was not located on the Premises because the deed referred to future wells drilled "on" the premises instead of referring to future leases or using subsurface words the Supreme Court described as common in its 1927 case: "oil and gas lying *under and within* the premises." (Emphasis added.) *Pure Oil*, 116 Ohio St. at 202; *see also Moore*, 2023-Ohio-3653, at ¶ 7 (7th Dist.) (where a reservation referred to production from oil and gas "in and under" the premises by virtue of a current or future lease).

{¶28} Appellee counters by arguing the common word "on" broadly encompasses various locations and is not limited to solely a location on top of a noun's surface, urging items below the surface of property are still "on these premises." It is emphasized Appellant's construction of the word would have far-reaching effects, noting under Appellant's argument, a deed's reference to pipelines laid "on the premises" would thereby not include buried pipelines. It is thus suggested Appellant is attempting to rewrite the deed to cover oil and gas produced only "from future wells having their surface location on these premises" instead of the broad coverage provided by the actual language, "from future wells drilled on these premises."

{¶29} If we find the language ambiguous rather than plain, then Appellant argues the parol evidence shows the Steiding Interest does not include oil and gas or royalties

from wells that do not physically enter from the surface of the Premises. Appellant also emphasizes a Supreme Court case construing a deed in light of oil and gas developments in the vicinity of the property when the deed was drafted. *See Detlor v. Holland*, 57 Ohio St. 492 (1898). Relying on this case, Appellant points to evidence from his expert on the available oil and gas technology when the deed was signed in 1918: "wells were drilled vertically or nearly vertical downward from the surface of the land to the oil and gas bearing strata" because horizontal or directional drilling was not a known technology until its first, limited use in Texas in 1929, which did not proliferate until more advanced technology became available in and after the 1980's. (Peterson Aff. ¶ 5-7).

{¶30} Although the expert did not mention the history of pooling, unitization, or community leases, Appellant says the deed's reference to the pre-existing wells necessarily referred to vertical wells started on the surface of the Premises and suggests the next line should likewise be construed consistently to mean "future wells drilled on [the surface of] these premises" which should not entitle Appellee to royalties for future wells entering from the under the surface. If we find an ambiguity and conclude the parol evidence does not resolve it, then Appellant urges the secondary rule of construction requires the deed to be construed against Steiding (as the grantor) and his successors (Appellee) and thus in favor of the interpretation proffered by Appellant (the grantee's successor).

{¶31} Appellee points out if horizontal drilling did not exist at the time of the 1918 deed, then there is no significance to the deed failing to specifically refer to its features when reserving the royalty interest. It is noted as to wells pre-dating the deed, the parties recognized the grantee may eventually drill those wells deeper to lower sands (in which case they would share in the royalty); this and the disputed provisions on not-yet-existent future wells indicate the parties were specifically looking to the future of the oil and gas industry, suggesting an intent to embrace new technologies in pursuit of increased royalties from these products.

{¶32} Appellee points to Appellant's own 2012 oil and gas lease, which precipitated the drilling of the SWN wells. Through the lease's pooling and unitization clause, Appellant granted the right to pool and unitize the leasehold, agreed to accept a share of the royalty from each unit proportionate to the leasehold acres, and agreed

drilling, operations, and productions as "to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold."  The resulting declaration of pooling and unitization likewise stated production from a unit shall be allocated, proportionally to acreage, across all leases and tracts in the unit, with operations or productions anywhere in the unit deemed to be operation or productions on each separate tract.

**{¶33}**  While Appellant argues his 2012 lease could not be relevant to the intent of the parties to the 1918 deed, Appellee points to it as an example of future advances in production technology falling within the intent expressed in the pertinent clause and an example of how the landowner's leases affect the Premises and those holding interests in them.  It is urged the inability to predict the future does not create a loophole for Appellant to burden the oil and gas while receiving royalties from those minerals or from other property in the unit in order to deprive Appellee of the royalty interest.  Appellee says Appellant's claim completely undermines the fundamental principles of pooling and unitization, which allows all royalty interest holders to be compensated for their minerals being placed in the unit subject to the possibility of a horizontal well (which may only be drilled under some of the mineral owners' pooled property).  This leads to Appellant's final argument.

**{¶34}**  Lastly, Appellant argues if this court holds the Steiding Interest applies to wells initiated off-premises, then we should exclude the Shroyer 2H well because the undisputed evidence shows this well does not travel beneath the premises.  (Van Sickle Aff. ¶ 13G); (SWN Inter. 4).  As the trial court explained, Appellant's 2012 lease granted SWN authority to sign the two declarations of unitization defining the Ballpark Unit and the Shroyer Unit, upon which SWN drilled four oil and gas wells:  "the Shroyer 4H, the Shroyer 2H, the Ballpark 2H, and the Ballpark 4H ('SWN Wells')."  (7/8/24 J.E. 4-5).  The court recognized, "The evidence establishes that of these, the wellbores of the Shroyer 4H, the Ballpark 2H, and the Ballpark 4H pass beneath the Property."  *Id.*

**{¶35}**  The trial court summarized Appellant's argument:  the phrase "on these premises" meant Appellee would receive no royalties under the current lease because *none* of the SWN wells are actually located "on" the Property if viewing the surface

location from which they are drilled. Broadly, the trial court ruled the deed "did not mean that the royalties from future wells were limited to wells where their surface location is physically located on the Property" while also pointing out a well consists of more than what is visible on the surface of the land and includes the entire wellbore. The court construed all SWN horizontal wells as being drilled on and producing oil and gas from the Premises and thus applied the declaratory judgment's fraction to the oil and gas being produced from the Premises without limiting it to only three of the four wells. Appellant asks that we partially reverse this judgment and conclude Appellee is not entitled to royalties attributable to the Shroyer 2H well because it does not travel under the Premises like the other three wells.

**{¶36}** Appellee responds by alleging Appellant waived this argument by failing to specify it to the trial court. "[T]he appellate court need not reach an argument which was waived by failing to raise it with the trial court." *Union Local School Dist. v. Grae-Con Constr., Inc.*, 2019-Ohio-4877, ¶ 32 (7th Dist.). A party's summary judgment filings must raise the specific legal argument claimed by the party on appeal. *Id.* at ¶ 30 ("Mentioning that a contract claim accrues when construction was completed does not raise the legal argument that a claim which accrues during the statute of repose is not subject to it."). The plain error doctrine in a civil case "is sharply limited to the extremely rare case involving exceptional circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). Even under such circumstances, the appellate court may exercise its discretion against employing the doctrine. *Union Local* at ¶ 30.

**{¶37}** Appellant's reply says he sufficiently raised the issue on page five of his summary judgment motion, which was part of a lengthy block quote of facts. After stating there are no wells drilled on the surface of the Premises, a sentence mentioned the Shroyer 2H well did not extend under any portion of the Premises. Appellant additionally cites to page four of his memorandum in opposition to Appellee's summary judgment motion, wherein he recapped Appellee's argument (to treat the wells as being drilled on the Premises because the premises are in the producing units and the horizontal laterals

of three wells travel under the Premises) and then footnoted an observation that the Shroyer 2H well does not extend under any portion of the Premises.

{¶38} Even if a separate legal argument should have been specified on just the fourth well, Appellant alternatively asserts the issue is appealable *because the trial court specifically mentioned the Shroyer 2H well's off-premises underground location in the judgment entry but nevertheless found it qualified as a well drilled "on" the Premises*. Regardless of the waiver issue, Appellee reiterates any argument by Appellant regarding off-premises wells is refuted by the pooling and unitization clause in the lease Appellant executed.

ANALYSIS

{¶39} First, we review the case Appellant quotes where the Supreme Court construed the following deed language: "excepting and reserving to [the] grantors, their heirs and assigns forever, all the royalty in the oil, gas, and gasoline, produced from wells drilled and now operated on first above-described tract of land [and] one-half of all the royalty in all the oil, gas, and gasoline produced from wells that may be hereafter drilled upon said tract of land, together with one-half of the rentals or other compensations or benefits arising therefrom . . ." *Pure Oil*, 116 Ohio St. 188 at syllabus. Appellant emphasizes the Court observed how the parties decided to avoid using common language such as, "reserving and excepting all the oil and gas lying under and within the premises hereby conveyed." *Id.* at 202. Appellant argues the Court's employment of the phrase "under and within" indicated these terms should be used when referring to the subsurface (instead of "on").

{¶40} However, the Supreme Court recently pointed out these latter portions of the holding constituted dicta, as the *Pure Oil* Court found the appealing party failed to perfect the record on appeal. *Peppertree Farms*, 2022-Ohio-395, at ¶ 25 (when rejecting the statement in the 1927 *Pure Oil* case about a royalty interest being personalty), citing *Pure Oil* at 198-199 (where the Court found the record insufficient and then set forth the statements on the royalty interest assuming arguendo the record was sufficient). Moreover, the *Pure Oil* case was not distinguishing the word "on" or "upon" from the phrase "under and within" or speaking of a drilling location; rather, the Court was contrasting a reservation of an interest in the corpus of all the oil and gas in the land with

a reservation of a fraction of a royalty in the oil and gas produced. *Pure Oil* at 201-204 (where Lowe conveyed minerals in place to an oil company with a reversionary interest, subsequently conveyed the reversionary interest to Kindall with a royalty reservation, and then claimed the reservation was a half interest in the corpus of the minerals with a right to extend the oil lease and thus the time period for reversion). Additionally, the quote emphasized by Appellant was preceded by "such as" and was thus merely an example; in fact, it was an illustration used to make a point on a subject that is not raised in the appeal of the case at bar.

{¶41} Appellee's argument on appeal is not rooted in a contention that the Steiding Interest was an interest in the corpus of the minerals; rather the argument indicates the reservation of a fraction of the oil and gas produced or the royalty from the production was a perpetual royalty interest. *See, e.g., Moore*, 2023-Ohio-3653, at ¶ 25-26 (7th Dist.) (landowner can create by reservation an oil and gas royalty, being a fractional interest in the production of oil or gas and resulting in a non-possessory and non-participating royalty interest, which may relate to existing and future development or leases). As recently clarified by the Ohio Supreme Court, this type of royalty interest is a real property right when unaccrued (due to the oil and gas remaining in situ); it is subject to retention or conveyance separately from the other incidents of mineral ownership. *Peppertree Farms*, 2022-Ohio-395, at ¶ 26-28. In said case, the Court explained:

> at the time [the original grantors] each conveyed the property, they owned an existing real-property interest in unaccrued royalties from the production of oil and gas, regardless of whether the property was then subject to an oil and gas lease. They could sever their present right to future royalties from both the surface and the mineral estate, which they did. And because they did so by excepting the royalty interest from the conveyance, their property rights in the partial interest to the oil and gas were absolute.

*Id.* This use of the term "royalty interest" is employed to refer one "stick" in the bundle constituting a mineral interest (not to be confused with a lease royalty). *Id.* at ¶ 27 ("[t]he right to receive royalty in the future is one of the separately alienable incidents of ownership of the full mineral interest"); *see also DeVitis v. Draper*, 2017-Ohio-1136, ¶ 18 (7th Dist.) (the separately conveyable sticks in a severed mineral estate include the rights

to: royalty payments; develop/extract {including ingress and egress}; lease {the executive right}; delay rentals; and bonus payments).

**{¶42}** It is uncontested that the term "premises" in the 1918 deed reserving the royalty interest includes both the surface and the minerals and that horizontal wells with laterals underlying the Premises would constitute "wells drilled" (or that they are producing from the oil and gas in these Premises). Instead, Appellant's argument relies on the word "on" in the phrase from "future wells drilled on these premises" contained in the deed reservation. In so doing, Appellant quotes one of the alternate definitions from www.mirriam-webster.com/dictionary, which states "on" can be "used as a function word to indicate position in contact with and supported by the top surface of [something]."

**{¶43}** Nevertheless, the word "on" can encompass more than this "top surface" definition, as can be seen in the alternate definitions provided in the secondary source provided by Appellant. By way of further example, www.dictionary.com provides definitions for "on" that include: "so as to be or remain supported by or suspended from"; "so as to be attached to or unified with"; "in connection, association, or cooperation with"; "as a part or element of"; or "so as to be a supporting part, base, backing, etc., of." As the Supreme Court emphasizes: "Even though most words in the English language have multiple meanings, ambiguity should not be created where it does not exist." *Dominish*, 2011-Ohio-4102, at ¶ 7.

**{¶44}** Since Appellant uses an example in a 1927 Supreme Court case, we provide another contemporaneous example − one where the Court used a phrase similar to the one at issue in the context of an underground entry into property. In addressing subsurface trespassing, the Supreme Court spoke in terms of the coal mining operation encroaching "on the land of another" even though there was no entry from the plaintiff's surface. *Brady v. Stafford*, 115 Ohio St. 67, 75, 79 (1926) (where the claim involved coal "taken from under the premises of the plaintiff" by defendants who used their own mine's entry to dig "rooms" and "break into" a coal vein underlying the plaintiff's property; in ruling on damages depending on whether the trespass was inadvertent or willful). Appellant's definition of the word "on" is merely one of the subcategories of the word that would qualify under the language used by the Steiding Interest in the context of land or premises.

Case No. 24 MO 0013

**{¶45}** We also point out the 1898 *Detlor* case cited by Appellant involved an 1890 conveyance of "minerals" in conjunction with coal where terminology was used related to the mining of non-migratory minerals at a time when oil and gas was not produced in the area. *Detlor*, 57 Ohio St. at 503. The scope of a noun representing the very product to be mined was at issue. The Court specifically emphasized the importance of the external context "when the question arises whether a specific mineral is included in a general designation." *Id.*, (and the Court was applying a case specifically applicable to the word "mineral" in a deed), citing *Dunham v. Kirkpatrick*, 101 Pa. St. 36 (1882) (creating a rebuttable presumption a deed's use of the word "mineral" does not include oil and gas).

**{¶46}** To the contrary, in this case, oil and gas were specified in the deed, as was the right to share in the production from future wells drilled on the premises. The issue raised here is the meaning of a common prepositional phrase. The fact that only vertical wells were in use at the time of the 1918 deed does not give the word "on" special meaning or suggest the grantor was not reserving the royalty interest for all production from the land. It is ordinary and not unreasonable to use the word "on" in phrases such as "on the property" or "on the premises" to include not only surface activities (as argued by Appellant) but also to include subsurface mining activities.

**{¶47}** As recited above, merely because a phrase in a deed might be subject to competing interpretations does not mean it is ambiguous; if one competing interpretation conflicts with the deed's purpose or structure or if it strains ordinary usage, then it cannot be considered reasonable and would not make the deed ambiguous. *Corder*, 2024-Ohio-5432, at ¶ 14. Considering the purpose and structure of the deed containing the reserved royalty interest, the unreasonable construction would be to read the phrase as *only* including a well with the original wellbore commencing on the surface of these premises.

**{¶48}** The purpose of the reservation was to retain a royalty interest in the oil and gas so the grantee would share with the grantor in the production from the oil and gas retrieved through future wells. Methods of drilling were not specified or excluded with regards to future wells. In the context of a deed conveying the property but reserving to the grantor the oil and gas produced or the royalty, the phrase "from future wells drilled on the premises" plainly includes wells initially drilled from the top surface of the premises

as well as wells entering the premises by being drilled horizontally from adjacent property. It does not restrict the royalty interest to a particular entry point.

**{¶49}** Appellant's construction of the deed would mean owners of royalty mineral interests could be deprived of their rights with regard to oil and gas production when the landowner (who owns the other half of the royalty interest and all the other sticks) enters a pooling agreement and ensures surface activities occur outside of the premises. Under such construction, the landowner could ensure the premises are never drilled from the surface while their minerals are held in a unit with multiple wells, some of which are directly boring through and depleting the minerals of the premises by drilling into those minerals from under the surface horizontally, while the surface owner collects the entire royalty. This would constitute an absurd reading of the deed. *Alexander*, 53 Ohio St.2d at 245-246 ("common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument"); s*ee also Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 634 (Tex. App.2000) ("Each tract traversed by the horizontal wellbore is a drillsite tract, and each production point on the wellbore is a drillsite.").

**{¶50}** Contrary to the alternative contention Appellant makes after focusing attention on the on-versus-under argument, the trial court's judgment need not be confined to the three wells drilled horizontally under the premises. As Appellee points out, this ignores the effects of the pooling and unitization accomplished by the lease Appellant signed which produces royalties based on these Premises. Being the party entering leases to generate royalties from the oil and gas on the Premises, Appellant agreed the wells in the unit would be deemed to be wells on the Premises even if they were not (yet or ever) located within the bounds of those premises.

**{¶51}** Appellant asks how the 2012 lease of all his acres and the lessee's unitization declaration could be relevant to the application of the 1918 deed. However, the reservation of the royalty interest stick (in the bundle constituting the mineral interest) on these Premises necessarily meant a lease royalty payment in a future lease covering the Premises would be pertinent; that is the function of the perpetual royalty interest. Appellant exercised an executive right to enter a lease to produce the oil and gas while

Appellee has a real property royalty interest in the production of the oil and gas. The payments under the lease inure to the benefit of the landowner/lessor and to a non-participating royalty interest. On this basis, the terms of the 2012 lease provide evidence of what Appellant agreed would be considered a well drilled on the premises.

**{¶52}** In support, we point out where the landowner engages in voluntary pooling, different jurisdictions have different positions on whether a non-participating royalty interest ("npri") must consent to or ratify a pooling and unitization clause in a lease signed by the landowner with the executive right (before the npri's royalty may be altered). *See Gastar Expl., Inc. v. Contraguerro*, 239 W.Va. 305, 313 (2017) (where the West Virginia Supreme Court counted its state among the four states employing the contract theory instead of the cross-conveyance theory used by four other states).

**{¶53}** The states utilizing the cross-conveyance theory deem the mineral title to be merged or transferred among the royalty owners across the unit and thus require the npri's consent or ratification to the lease pooling and unitization clause; otherwise, the npri may receive undiluted royalties depending on the premises traversed by laterals. *See, e.g., Montgomery v. Rittersbacher*, 424 S.W.2d 210, 213-215 (Tex.1968). Under such theory, "pooling on the part of the holder of the executive rights cannot be binding upon the non-participating royalty owner in the absence of his consent." *Id.* at 213 (the npri's filing of a lawsuit seeking royalties under the landowner's lease constitutes ratification if consent or ratification was not provided earlier).[5]

**{¶54}** Distinctly, the states using the contract theory conclude consent or ratification by the npri is not required, as the npri conveyed by deed executive leasing rights, which necessarily includes the power to pool and unitize to increase the likelihood production occurs. *Gastar* at 313-315. Rather than a cross-conveyance of title between pooled land, in the states adopting the contract theory, "pooling results in a consolidation

---

[5] In weighing dilution of the royalty versus participating in royalties from additional land, the npri in Texas can tactically calculate the ratification decision depending on where the wellbores run. *See, e.g., BPX Operating Co. v. Strickhause*n, 629 S.W.3d 189, 193 (Tex. 2021) (the strategizing npri was informed the lack of ratification meant the royalty would be calculated "based on the length of productive wellbore on the subject tract over the total length of productive wellbore" instead of the entire unit's production); *Brown v. Smith*, 141 Tex. 425, 431 (1943).

of contractual and financial interests regarding the drilling and production of oil and gas from the combined parcels of land." *Id.* at 315.[6]

**{¶55}** In other words and either way, the landowner who signs a lease stating the drilling on any part of the unit is drilling on all parts is not thereby able to deprive the npri of royalties. *See Montgomery* at 212 ("enlargement or diminishment of the rights of a prior non-participating royalty owner can be accomplished by the holder of the executive rights executing an oil, gas, and mineral lease which includes either a pooling clause or an entirety clause, provided the non-participating owner ratifies such action"); *Gastar* at 314 (npri interest created by the deed transferring all remaining interests in the parcel to the grantee obviously contemplated the party with executive leasing rights would be allowed to conduct negotiations on behalf of the npri in order to facilitate production).

**{¶56}** Although the subject of npri ratification of pooling and unitization is not at issue in this appeal, the law behind both of the two competing theories inherently shows *the npri is not excluded from royalties* where the landowner signs a lease under which pooling and unitization thereafter occurs causing horizontal wellbores to run under part of the unit, even if not directly under the Premises bound by the npri. Accordingly, the fact that the fourth well's bore did not run under the Premises did not deprive Appellee of royalties associated with said well (which shared a unit with a well that did run under the premises). In short, Appellee shares in the royalties on the Shroyer 2H well even if it did not horizontally traverse under the Premises from the pooled or unitized property.

**{¶57}** For the foregoing reasons, Appellant's arguments are without merit. The trial court's judgment is affirmed.


Hanni, J., concurs.

Dickey, J., concurs.

---

[6] We have pointed out pooling and unitization encourages the use of new technology to optimize a common supply, increases efficiency, conserves natural resources, prevents waste from over-drilling, minimizes surface disruption, and avoids well spacing and drilling unit acreage permitting issues while allowing smaller tracts to participate. *See, e.g., Paczewski v. Antero Resources Corp.*, 2019-Ohio-2641, ¶ 3-5 (7th Dist.).

---

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**